PARTIDO NUEVO PROGRESISTA (P.N.P.) representado por su comisionado HON. FRANCISCO GONZÁLEZ, JR., peticionario y recurrente, *v.* HON. MARCOS RODRÍGUEZ ESTRADA, PRESIDENTE DE LA COMISIÓN ESTATAL DE ELECCIONES, COMISIÓN ESTATAL DE ELECCIONES (C.E.E.), EUDALDO BÁEZ GALIB, COMISIONADO ELECTORAL DEL PARTIDO POPULAR DEMOCRÁTICO (P.P.D.) e HIRAM MELÉNDEZ, COMISIONADO ELECTORAL DEL PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO (P.I.P.), demandados y recurridos.

*Número:* CE-88–722 *Resuelto:* 21 de diciembre de 1988

2

4

8

*Miguel Pagán* y *Eliezer Aldarondo Ortiz*, abogados del peticionario; *David Rivé Rivera* y *Mariano Canales Delgado*, abogados de Marcos Rodríguez Estrada y la Comisión Estatal de Elecciones, recurridos.

El Juez Presidente Señor Pons Núñez emitió la opinión del Tribunal.

El pasado 18 de noviembre de 1988, el Partido Nuevo Progresista (P.N.P.) presentó un recurso de revisión en el tribunal de instancia en el que solicitó la revisión de una resolución[1] emitida por la Comisión Estatal de Elecciones (C.E.E.) el 17 de noviembre de 1988. Mediante la misma se decidió anular, en el recuento de la votación llevada a cabo en el Municipio de San Juan durante las Elecciones Generales de 1988, aquellas papeletas que tuviesen en su parte posterior las iniciales del elector. La resolución en cuestión contó con la aprobación de todos los partidos, excepto el peticionario P.N.P. Se acompañaron al recurso diez (10) papeletas y se alegó, expresamente, que dichas iniciales fueron colocadas al dorso[2] de esas papeletas por los electores como consecuencia de una instrucción "errónea, incompleta o confusa de parte de los propios funcionarios del Colegio de Votación" (alegato del recurrente, pág. 2), y que al anular las mismas se privaba a un grupo de electores de su derecho al voto en violación de la Constitución del Estado Libre Asociado de Puerto Rico y de la de Estados Unidos.

Aun cuando de las papeletas que acompañaron a la solicitud surge que las mismas representan votos para distintos partidos, no surge de los autos que los electores posiblemente afectados fueran parte en los procedimientos ante la

---

[1] Copia de la resolución de la Comisión Estatal de Elecciones (C.E.E.) *no se acompañó* al recurso presentado en el tribunal de instancia *ni se acompaña al recurso instado en este Tribunal.* Tampoco se ha explicado porqué no se hizo. Regla 6(d)(1) de las aplicables a los Recursos para las Decisiones Administrativas ante el Tribunal Superior, 4 L.P.R.A. Ap. VIII-A; Regla 17 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A; *In re Reglamento del Tribunal Supremo,* 116 D.P.R. 670 (1985).

[2] Una de las papeletas que acompaña a la solicitud de revisión tiene una inicial, la letra "K", en su propia faz y no contiene iniciales extrañas al dorso.

C.E.E. o en el tribunal de instancia.(3) Luego de algunos incidentes procesales se celebró la correspondiente vista el 5 de diciembre pasado. Durante la mañana de ese día se escucharon, por un período de aproximadamente tres (3) horas, los argumentos de las partes sobre varios aspectos legales del caso. Los opositores presentaron diversos argumentos que equivalían a solicitudes de desestimación.

Después de escuchar ampliamente a todas las partes sobre las distintas cuestiones de derecho planteadas, el tribunal determinó que al reanudar la sesión a las 2:00 P.M. se comenzaría a escuchar la evidencia de la parte recurrente. Al comenzar el desfile de prueba la parte recurrente presentó, como su primer testigo, al Sr. José A. Carlo Rodríguez, Comisionado Electoral alterno del P.N.P. Luego de ciertas preguntas preliminares a dicho testigo, se decretó un receso para que él pudiese examinar la evidencia documental que tenía disponible la parte recurrente, a saber, fotocopia del frente y el dorso de trescientas cincuenta y siete (357) papeletas que la parte demandante había anunciado presentaría al tribunal.

Luego de dicho receso el testigo declaró que había podido examinar aproximadamente la mitad de las papeletas, *que no le podía dar al Tribunal ninguna información en cuanto a qué había ocurrido en aproximadamente las dos terceras partes de las papeletas así examinadas, pues no aparecía en las mismas anotación de clase alguna que permitiera formar una conclusión sobre el particular, y que con relación a la otra tercera parte de las examinadas podía decirle al Tribunal que el trámite administrativo no había sido agotado y*

_____

(3) De conformidad con el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, cualquier parte afectada por una resolución de la comisión podrá recurrir al Tribunal Superior mediante escrito de revisión dentro de los diez (10) días siguientes a la notificación de tal determinación. Este término ha expirado ya en este caso. Los autos originales han sido elevados y examinados por este Tribunal.

*que las papeletas no habían llegado al nivel de una decisión
por la Comisión Estatal de Elecciones en propiedad.*

A la luz de lo anterior, el Tribunal le comentó al abogado de
la parte recurrente que si la situación era como señalaba su
propio testigo el caso no podía proseguir. Se suscitó entonces
una corta discusión sobre el asunto, luego de la cual el abo-
gado de la parte recurrente le indicó al Tribunal *que sometía
el caso completo sin evidencia de clase alguna,* pues entendía
que *como cuestión de derecho* las papeletas no podían ser anu-
ladas aun cuando tuvieran al dorso unas iniciales en adición a
las iniciales de los funcionarios de mesa del colegio de vota-
ción. El Tribunal advirtió expresamente al abogado que si so-
metía el caso de esa forma el Tribunal no tendría otra alterna-
tiva que la de desestimar el mismo, y el abogado insistió en
que así lo sometía. El Tribunal entonces determinó en corte
abierta que desestimaba el recurso. (Énfasis suplido y en el
original.) Sentencia, págs. 5–6.

Es importante advertir que, no obstante la desestimación
del recurso, el tribunal de instancia hizo claro "que la . . .
sentencia no expresa opinión de clase alguna en cuanto al
derecho que pudiese tener cualquier candidato a elección de
impugnar la certificación de cualquier otro candidato, con-
forme el trámite establecido en el artículo 6.014 de la Ley
Electoral vigente, 16 L[.]P[.]R[.]A[.] 3274". Sentencia,
pág. 9.

De dicha determinación recurren los peticionarios ante
nos alegando, en síntesis, que incidió la C.E.E. al anular las
papeletas iniciadas por los electores y el tribunal a quo al
desestimar el recurso de revisión a que se refiere este caso.

I

Versa este recurso, esencialmente, sobre uno de los
más fundamentales derechos políticos de los puertorri-

queños: la secretividad del voto.[4] Éste, conjuntamente con el derecho al más amplio acceso al proceso de votación, constituyen pilares de la democracia puertorriqueña. En relación con las Elecciones Generales de 1988 ya hemos tenido ocasión de atender reclamos referentes a este segundo pilar. En *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490 (1988), nos enfrentamos al requerimiento de ampliar el acceso al ejercicio del derecho al voto y respondimos ordenando a la C.E.E. que ampliara e hiciera viable hasta el propio día de las elecciones ese derecho a todos los electores excluidos de las listas electorales por errores atribuibles a la C.E.E.

Ahora, como hemos señalado, nos toca atender reclamos referentes a la secretividad del voto.

Si bien el voto es uno de los derechos de más preeminencia e importancia en nuestro sistema constitucional, el mismo, al igual que todo otro derecho, no es absoluto. Puede ceder ante intereses públicos apremiantes en pro del bienestar común, la sana convivencia y para salvaguardar el ejercicio mismo de ese derecho. Una de las instancias en la que debe ceder este derecho al voto es cuando se viola el postulado constitucional de la secretividad. No cabe duda que el Estado posee un interés extremadamente apremiante en preservar el principio del voto secreto.

Para una cabal comprensión del tema que tratamos y del interés preponderante del Estado en esta área, conviene re-

---

[4] La inserción de Macondo en esta controversia, ese pueblo imaginario y universalmente latinoamericano producto de la maravillosa imaginación y vivencias socioculturales de Gabriel García Márquez, debe obedecer, a nuestro juicio, a una muy particular interpretación literaria que desconoce la universalidad de *Cien Años de Soledad.* Es esa obra de arte (novela) una que se desmerece si se le atribuyen proyecciones cromáticas particulares a la política puertorriqueña. Macondo tiene tanta relevancia a esta controversia como tendría la cantaleta de Fernanda. G. García Márquez, *Cien Años de Soledad,* 16ta ed., Buenos Aires, Ed. Sudamericana, 1970, pág. 281 y ss.

Contrario a la alusión literaria y posición minoritaria, lo que hacemos es proteger al elector para que no se conozca su tinte político cuando ejerce su voto.

cordar el trasfondo histórico sobre el que se erige la disposición de la Constitución del Estado Libre Asociado de Puerto Rico que consagra ese derecho para el electorado puertorriqueño. Con ese propósito adoptamos el excelente resumen histórico que hizo el entonces Juez Presidente Señor Trías Monge en su opinión disidente en el caso *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 270–277 (1980). Narra el referido magistrado lo siguiente:

La experiencia del pueblo de Puerto Rico en el ejercicio de la franquicia electoral ha sido corta y mayormente aciaga. Desde 1493 hasta la convocatoria a Cortes de 1810 no se celebraron elecciones en el país, excepto las convocadas esporádicamente para la selección, con grandes cortapisas, de los regidores y alcaldes ordinarios. Las primeras elecciones por voto directo tuvieron lugar el 30 de mayo de 1869. El primer partido político no se constituyó formalmente hasta un año más tarde. F.M. Quiñones, *Historia de los Partidos Reformista y Conservador*, Madrid, Imp. de J.F. Morete, 1889, *passim*. J.M. de Labra, *América y las Constituciones Españolas de 1812*, Madrid, Tip. Sindicato de Publicidad, 1914.

La votación de 1810 y las que ocurrieron bajo la Constitución de Cádiz de 1812 fueron de tipo indirecto, de tres grados. Para su descripción, véase: L. Cruz Monclova, *Historia de Puerto Rico*, Río Piedras, Ed. Universitaria, 1958, T. I, pág. 31, y los capítulos primero a quinto del título tercero, y el primero y segundo del título sexto de la Constitución gaditana. E. Tierno Galván, *Leyes Políticas Españolas Fundamentales (1808–1936)*, Madrid, Ed. Tecnos, 1968, pág. 26 y ss. La picaresca electoral, según la frase de Sánchez Agesta, tanto en la forma de fraude privado como de actuación por parte del gobierno, le restó seriedad al proceso eleccionario de esa época. L. Sánchez Agesta, *Historia del Constitucionalismo Español*, 2da ed., Madrid, Instituto de Estudios Políticos, 1964, págs. 163–173, 443–447.

Nuestros primeros partidos políticos nacieron también en momento de gran corrupción electoral. Sobre el período constitucional septembrino ha escrito Carro Martínez:

"El régimen representativo andaba a la deriva; la indiferencia política que en el pueblo español creaban las irregulari-

dades electorales le mantenía apartado de las urnas. Los sufragios eran unas veces, las más, un mandato de los Gobernadores civiles, de los Comités y de los caciques de los pueblos." A. Carro Martínez, *La Constitución Española de 1869*, Madrid, Ed. Cultura Hispánica, 1952, pág. 29. Carro Martínez hace, más adelante, *op. cit.*, pág. 110, comentarios que aplicaban tanto a la España como al Puerto Rico de la época:

"Tanto los gobernadores como los gobernados faltaban a sus deberes. Las faltas de autoridad hacían nacer sufragios inexistentes en favor del Gobierno; las faltas del pueblo incrementaban por lo general los votos republicanos. La cosa se explica con facilidad; da la casualidad que en las provincias donde el Gobernador Civil era progresista, las elecciones eran de color progresista; donde el Gobernador era unionista, triunfaban los unionistas, y casi siempre resultó que las elecciones eran el vivo retrato de las ideas del Gobernador."

La participación puertorriqueña en las elecciones era escasa. De una población de 650,000 habitantes participaron 4,000 electores en los comicios de 1869, número que se elevó en 1871 a 15,851. L. Cruz Monclova, *op. cit.*, T. II, 1ra parte, págs. 19, 167. En 1876, no obstante, en los tiempos aún más dificultosos de la Restauración, la cifra descendió a 1,900. J.M. de Labra, *op. cit.*, pág. 12. Bajo la Constitución de 1876 las Cortes no eran verdaderamente representativas, ya que el gobierno influía decisivamente en su composición. Los ayuntamientos y las diputaciones provinciales eran también formas vacías, pues los gobernadores regían sus actuaciones. J. Costa y Martínez, *Crisis Política de España*, 3ra ed., Madrid, 1914, y del mismo autor, *Oligarquía y Caciquismo como la Forma Actual de Gobierno en España*, Madrid, Imp. de los Hijos de M.G. Hernández, 1902.

Las primeras elecciones locales en 1869 se celebraron conforme a las disposiciones del Real Decreto de 14 de diciembre de 1868, 100 *Colección Legislativa de España* 925, basado en el Real Decreto, luego ley, de 9 de noviembre de 1868, 100 *Colección Legislativa de España* 578, aplicable propiamente a España. Esta legislación imponía el uso del sistema de colegio abierto, entre 9:00 a.m. y 3:00 p.m. El Real Decreto de 1 de abril de 1871, 106 *Colección Legislativa de España* 633, dispuso para la celebración en Puerto Rico de las elecciones del

20 de junio y días siguientes de 1871. Éstas debían verificarse de acuerdo con la referida ley de 14 de diciembre de 1868, por lo que también se utilizó el colegio abierto.

Nuestros primeros partidos vivieron una vida azarosa. Hubo persecución sistemática de los partidos liberales, con el consiguiente efecto deplorable en el clima electoral. El Partido Liberal Reformista dejó prácticamente de existir en los años de 1874 a 1881. Intentó rehabilitarse en 1883, pero pronto expiró. J. de Celis Aguilera, *Mi Grano de Arena*, San Juan, Imp. de Acosta, 1886, págs. III, 97 y ss.; J.G. Gómez y A. Sendras y Burín, *Isla de Puerto Rico*, Madrid, Imp. de Gil y Navarro, 1891, págs. 75, 136; J.A. Gautier Dapena, *Trayectoria del Pensamiento Liberal Puertorriqueño en el Siglo XIX*, San Juan, Instituto de Cultura Puertorriqueña, 1963, pág. 91.

Su sucesor, el Partido Autonomista, organizado en 1887, fue combatido desde el comienzo. J.M. de Labra, *La Cuestión Colonial*, Madrid, Tip. de Gregorio Estrada, 1898, pág. 29; P. Barbosa del Rosario, *La Comisión Autonomista de 1896*, San Juan, Imp. Venezuela, 1957, págs. 73, 111, 128; L. Cruz Monclova, *Historia de Puerto Rico*, Río Piedras, Ed. Universitaria, 1962, T. III, 2da parte, pág. 264. A partir del triunfo del Partido Autonomista, capitaneado por Baldorioty de Castro, en las elecciones de marzo de 1887, se desató la era temible de los compontes. A.S. de Predreira, *El Año Terrible del 87*, San Juan, Bibilioteca de Autores Puertorriqueños, 1948. El partido acudió usualmente a la abstención electoral a partir de 1891. P. Barbosa del Rosario, *De Baldorioty a Barbosa*, San Juan, Imp. Venezuela, 1957, pág. 245 *et seq.*

Al finalizar el período de gobierno español, en Puerto Rico continuaba el sistema de colegio abierto. Véanse el Real Decreto de 31 de diciembre de 1896 y el de 25 de noviembre de 1897, el último de los cuales adaptó a Cuba y Puerto Rico la Ley Electoral Española de 26 de junio de 1890. 3 *Laws, Ordinances, Decrees and Military Orders*, Washington, Government Printing Office, 1909, pág. 1795 y ss. Esta legislación incluía fuertes penalidades y otras supuestas garantías contra el fraude electoral. Aun así continuó la inconformidad general con las prácticas electorales. L. Cruz Monclova, *Luis Muñoz Rivera*, San Juan, Instituto de Cultura Puertorriqueña, 1959, pág. 638 y ss.

Durante el período de gobernación militar se celebraron las llamadas elecciones de los cien días. Preocupado por los hábitos electorales prevalecientes, el General George W. Davis eliminó el sufragio universal varonil vigente y permitió que votasen tan s[ó]lo los contribuyentes de récord o los que supiesen leer y escribir, si hubiesen residido en Puerto Rico los dos años precedentes a su inscripción. O.G. 145 de 21 de septiembre de 1899. Aun así la campaña fue violenta. Luis Muñoz Rivera describió estas elecciones como las más difíciles, "cien batallas campales" de salvajes tumultos y choques cruentos. *Obras Completas de Luis Muñoz Rivera (1890–1900)*, Madrid, Ed. Puerto Rico, 1925, pág. 256.

Ante esta situación tampoco se consagró directamente el sufragio universal varonil en la Ley Foraker. El Secretario de la Guerra, Elihu Root, entre otros, se oponía a su concesión. L.J. Gould, *La Ley Foraker: Raíces de la Política Colonial de Estados Unidos*, Río Piedras, Ed. U.P.R., 1969, pág. 72. El Art. 29 de la Ley Foraker, 31 Stat. 82 (1900), mantuvo en vigor las leyes españolas y las órdenes militares existentes, sujeto a las condiciones que fijase el Consejo Ejecutivo para las primeras elecciones y a las que estableciese para el futuro la Asamblea Legislativa.

El 1 de marzo de 1902 se aprobó una Ley Electoral que continuó el colegio abierto en Puerto Rico. *Estatutos Revisados de 1902*, págs. 115, 123. Ningún esfuerzo legislativo para lograr elecciones pacíficas, limpias y libres tenía éxito. El doctor Fernós Isern escribió lo siguiente sobre esta primera época:

"La Isla llegó a estar al borde de la guerra civil. En San Juan, el periódico *Diario de Puerto Rico* de Muñoz Rivera fue asaltado y su planta destruida. En San Lorenzo se libró un combate a la entrada del pueblo cuando la Policía trabó lucha con un grupo de campesinos que acompañaban un entierro, se alegó que venían a atacar la población. Los campesinos eran Federales. En Yabucoa, en Cayey, ocurrieron balaceras frecuentes. Se hacían arrestos viciosos para humillar personas honorables. Se llamó a esta época de 'las turbas'. A. Fernós Isern, *Estado Libre Asociado*, Puerto Rico, Ed. U.P.R., 1974, pág. 15."

Las turbas golpearon a los seguidores del partido minoritario de entonces y destruyeron la imprenta del periódico de

don Luis Muñoz Rivera. Como resultado, se procesó al propio Muñoz Rivera por el delito, según denunció él, "de defender su domicilio". L. Muñoz Rivera, *Campañas Políticas*, Madrid, Ed. Puerto Rico, 1925, Vol. II de las Obras Completas, pág. 10.

Varios gobernadores, entre ellos Hunt en 1904, Winthrop en 1905 y 1906, Post en 1908, Colton en 1911 y Yager en 1915 y 1916, criticaron acerbamente el sistema electoral del país y recomendaron su reforma. N. Rigual, *Reseña de los Mensajes de los Gobernadores de Puerto Rico (1900–1930)*, 1966, págs. 39, 48, 61, 73, 137, 144–45.

En 1906 se aprobó una nueva Ley Electoral, *Leyes de P.R.*, 1906, pág. 33 y ss., y otra en 1919, Ley Núm. 79 de 25 de junio de 1919, sin que estas leyes y sus enmiendas hiciesen mella significativa en las prácticas censuradas. Sobre las elecciones de 1924 ha escrito Henry Wells, *La Modernización de Puerto Rico*, trad. de P.G. Salazar, Puerto Rico, Ed. Universitaria, 1972:

"La elección fue, sin embargo, tan irregular que los resultados oficiales posiblemente hayan exagerado la fuerza de los vencedores. Como los unionistas y los republicanos de Tous Soto habían heredado un control completo de la maquinaria electoral, inclusive un monopolio de los oficiales de mesa y observadores, no vacilaron en cometer fraude en muchos distritos. La compra de votos y la intimidación de los electores llegó a extremos nunca vistos. Pág. 110.

Véanse también, sobre la corrupción en esta y otras elecciones hasta los años cuarenta: B. Pagán, *Historia de los Partidos Políticos Puertorriqueños*, 1959, Vol. I, págs. 244–47; G.K. Lewis, *Puerto Rico, Libertad y Poder en el Caribe*, Río Piedras, Ed. Edil, 1969, págs. 195, 199; E.P. Hanson, *Transformation: The Story of Modern Puerto Rico*, New York, Simon and Schuster, 1955, págs. 39, 45–46, 173, 180, 185.

Para 1929 el fraude estaba tan arraigado, conforme a observadores de la época, que el sistema electoral del país continuaba en descrédito. E. Ramírez Brau, *Mancha Roja o historia breve de un elector que no se manchó*, Ponce, Ed. El Día, 1929, págs. 9, 16. En 1936 se llegó hasta el patrocinio de un concurso para premiar los mejores relatos de violaciones a las leyes electorales. D. Targa, *El Modus Operandi de las Artes*

*Electorales en Puerto Rico*, San Juan, Imp. Puerto Rico, Inc., 1940, pág. 8 y ss. Targa describe ampliamente las técnicas de la compraventa del voto, el acorralamiento de electores para provocar su abstención, los tiroteos y otros medios prevalecientes entonces para corromper el proceso electoral. Véase también: T. Mathews, *Puerto Rican Politics and the New Deal*, Gainsville, Fla., U. of Fla. Press, 1960, págs. 263, 301–02. Las listas electorales estaban plagadas de errores. De acuerdo con un censo de la P.R.R.A., "de 852,832 personas mayores de veintiún años en la isla, 852,904 [sic] son votantes inscritos". El fraude más obvio fue en la municipalidad de Coamo, donde el censo encontró 9,775 habitantes mayores de veintiún años. Los electores inscritos en esta municipalidad eran la bagatela de 14,144 ó, en términos de porcentaje, 144 por ciento de los habitantes eran electores inscritos en Coamo. Mathews, *ibid.*, pág. 263. Véase, además: *Congressional Record*, Senado, Vol. 80, parte 6, págs. 5,923–5,927.

La Ley Núm. 3 de 29 de junio de 1936, que enmendó la de 1919, cambió el sistema de colegio abierto por el de colegio cerrado "para evitar el voto repetido que dio en el pasado motivo para fraude". B. Pagán, *op. cit.*, T. II, pág. 114. No fue hasta los años cuarenta que rindió fruto esta legislación después de la intensa campaña educativa librada por el partido que advendría al poder a comienzos de la década. C. Ramos de Santiago, *Gobierno de Puerto Rico*, Puerto Rico, Ed. U.P.R., 1970, pág. 94 y n. 148; H. Wells, *op. cit.*, págs. 284–85. Contribuyó a este resultado la creación de un importante uso constitucional: a partir de 1940, hasta 1974, los cambios que sufrieron las legislaciones de 1919 y años subsiguientes se efectuaron tan s[ó]lo con el pleno consentimiento de los partidos políticos representados en la Asamblea Legislativa. E. P. Hanson, *op. cit.*, pág. 184.

Este es el historial que tuvo ante sí la Asamblea Constituyente. La honestidad y la paz entonces reinantes estaban en su infancia. Apenas contaban doce años de edad. Tras ellas se alzaba la larga y tétrica experiencia que hemos reseñado. De este trasfondo nacen, y a su luz debemos interpretar, el Preámbulo, la Sec. 1 del Art. I y las Secs. 1 y 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. (Escolio omitido.)

Véase, además, 2 Diario de Sesiones de la Convención Constituyente 1402–1403 (1951–1952), donde se señalan los propósitos que se persiguen al consagrar en nuestra Constitución la secretividad del voto.

Atendiendo todo este transfondo histórico puertorriqueño es que nuestra Constitución dispone que:

> Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y *secreto*, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. (Énfasis suplido.) Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261.

No cabe duda, pues, que el Pueblo de Puerto Rico, al plasmar en su Constitución la secretividad del voto, lo hizo atendiendo un interés extremadamente apremiante de proteger al elector contra las coacciones y presiones indebidas que habían sido parte fundamental de amargas y deleznables experiencias políticas sufridas en el curso de su historia. Por eso en *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 755 (1976), señalamos:

> . . . el requisito de que el voto sea secreto, se dispuso con el propósito de ". . . asegurar la inviolabilidad del albedrío del elector."

Asimismo, en *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, supra, pág. 298, el Juez Asociado Señor Negrón García, en su opinión concurrente y disidente, agregó que:

> . . . el objetivo del voto secreto de un ciudadano es asegurarle contra y protegerlo de las coacciones, para garantizarle la libertad de poder entrar a la caseta electoral, solo con su conciencia, y hacer allí su cruz, secretamente, sin que a nadie le importe cómo y dónde la hizo. . . . Repetimos, es esencial que el voto sea confidencial, pues con ello "se evitan coacciones y represalias que pondrían en peligro la independencia del elector y la consiguiente sinceridad de su sufragio".

El interés del Estado en proteger este derecho es tan intenso que la propia disposición constitucional que lo

crea manda que las leyes lo garanticen y ordena la protección "al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Const. E.L.A., *supra*. De ahí que, a través de legislación, se tipificara como delito coaccionar al elector al emitir su voto o violar su secretividad. 16 L.P.R.A. sec. 3375(a). Como podemos notar, este modo dispuesto por nuestra Constitución para votar, además de proyectarse como uno de los más preciados derechos de nuestros ciudadanos, constituye también el medio a través del cual el Estado descarga su importante obligación de proteger el libre albedrío del elector.[5] Adviértase, entonces, que la renuncia de este derecho por el votante imposibilitaría al Estado de poder cumplir con la referida obligación constitucional. Debe tenerse presente que la propia decisión del elector de renunciar a emitir un voto secreto podría responder a presiones o coacciones, que es justamente lo que se interesa evitar con esta medida. De suerte que, distinto a otros derechos cuya renuncia no acarrea efecto o perjuicio alguno más allá de la persona que lo posee, en estos casos tal renuncia podría tener un impacto significativo en contra de los mejores intereses del pueblo y de nuestro sistema democrático. Sólo bajo circunstancias de fuerza mayor o imperativos superiores, tales como cuando se trate de electores no videntes o funcionarios electorales, puede levantarse el velo de secretividad que protege el ejercicio del sufragio. Acceder a planteamientos de derecho a la renuncia de dicha prerrogativa por el elector o a argumentos que propugnan la impotencia de la comisión para anular papeletas marcadas o iniciadas, significaría abrir la puerta a una época de oscurantismo electoral

---

[5] Este caso es totalmente distinguible del de *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400 (1980) ("pavazos"), pues este último trata sobre la *ubicación* de la marca mediante la cual el elector vota secretamente por su preferencia electoral, mientras que en el caso de autos se trata de marcas o iniciales con el efecto de identificar al elector.

que debe quedar confinada en el pasado, aunque recordada por los libros de historia para que jamás se repita.

■ Precisamente, sobre el mandato constitucional aludido es que descansan las prohibiciones de marcas o iniciales en la papeleta contenidas en la ley electoral y su reglamento.

## II

La legislación y reglamentación electoral vigentes atienden, además, ese mandato constitucional en forma amplia.[6] Veamos.

■ La Ley Electoral de Puerto Rico, en su Art. 1.003(35), 16 L.P.R.A. sec. 3003(35), define como *papeleta nula* aquella "votada por un elector que posteriormente a una elección la Comisión Estatal de Elecciones *determine que no debe contarse o consignarse a los efectos del resultado* de dicha elección". (Énfasis suplido.) Luego, en el inciso (36), define como *papeleta protestada* "aquella en que aparezca arrancada la insignia de algún partido; escrito un nombre, salvo que sea en la columna de candidatos no encasillados; o tachado el nombre de un candidato, *o que contenga iniciales, palabras, marcas o figuras de cualquier clase que no fueren de las permitidas para consignar el voto*". (Énfasis suplido.) 16 L.P.R.A. sec. 3003(36).

---

[6] La vigilancia e interés constante del Estado en esta materia lo ejemplifica la Comisión Especial para la Revisión del Proceso Electoral (C.E.R.P.E.), creada por la Asamblea Legislativa de Puerto Rico mediante la Resolución Conjunta Núm. 21 de 2 de julio de 1981, al emitir su informe que recomienda los cambios que culminaron en la Ley Núm. 3 de 10 de enero de 1983 que, a su vez, reformó integralmente la Ley Electoral de Puerto Rico. Esa comisión, en su informe, reconoció la intensidad del interés plasmado en el Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, al punto que recomendó que se limitara el número de recusaciones permitidas durante el día de las elecciones a fin de evitar, *inter alia*, "[q]uitarles el derecho al voto secreto a miles de electores". (Énfasis suplido.) Informe de la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico, 17 de mayo de 1982, pág. 29.

 Por su parte, el Art. 6.004 de dicha ley, dispone que:

Los votos de las papeletas protestadas no se contarán para los candidatos, pero se anotarán en las columnas del Acta del Colegio Electoral correspondiente, para que la Comisión Electoral actúe con relación a las mismas conforme se dispone en este Subtítulo con relación al escrutinio general. 16 L.P.R.A. sec. 3264.

Ya en el proceso del escrutinio general, establece el Art. 6.008 de la Ley Electoral de Puerto Rico, en su parte pertinente, lo siguiente:

Después que la Comisión Estatal hubiere recibido la documentación de las elecciones procederá a practicar un escrutinio general, interviniendo con las papeletas no adjudicadas y las *protestadas y contará o rechazará éstas,* según lo que a su juicio se requiera por ley . . . . (Énfasis suplido.) 16 L.P.R.A. sec. 3268.

 Por otro lado, las Reglas 71 y 78 del Reglamento Oficial de las Elecciones Generales de 1988 (Reglamento de Elecciones de 1988), págs. 82 y 89, disponen:

*R. 71—Reglas Especiales para la Adjudicación de Papeletas en el Escrutinio General o Recuento*

En el escrutinio general o recuento se actuará con relación a las papeletas no adjudicadas y las protestadas para determinar la validez o *nulidad* de éstas. En adición a los criterios de adjudicación dispuestos bajo las Reglas Núm. 51 y Núm[.] 52, las siguientes reglas tendrán aplicación en estos escrutinios.

*R. 78—Será Protestada Toda Papeleta:*

. . . . . . . .

c) que tenga escrito nombres o iniciales fuera de la columna de Nominación Directa, sean éstas al frente o al dorso de la papeleta, a excepción de lo que se expresa en la Regla Núm. 79 que sigue, o que sean las iniciales requeridas al dorso de las papeletas a los inspectores del colegio. (Énfasis suplido.)

Resulta evidente de los Arts. 1.003(36) y 6.008, *supra*, y de las Reglas 71 y 78, *op. cit.*, que la Ley Electoral de Puerto Rico y su reglamento se ocupan de prevenir el que se utilicen marcas o *iniciales* que puedan servir para identificar el voto de algún elector. Ellas facultan a la C.E.E., obviamente con el fin de desalentar esa práctica, a anular las papeletas marcadas o iniciadas y se establece el procedimiento que debe seguirse para hacerlo. El Art. 1.003(36) de la Ley Electoral de Puerto Rico, *supra*, y la Regla 78 del Reglamento de Elecciones de 1988 disponen que las papeletas marcadas o iniciadas serán protestadas y, en virtud de los Arts. 6.004 y 6.008 de la Ley Electoral de Puerto Rico, *supra*, se faculta a la C.E.E. a examinar, adjudicar o rechazar esas papeletas en el escrutinio general o en el recuento (Art. 6.011 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3271). Según el texto del Art. 1.003(35) de la Ley Electoral de Puerto Rico, *supra*, por definición, el rechazo de una papeleta equivale a anular la misma. Es por esa razón que la Regla 71 del Reglamento de Elecciones de 1988, págs. 82–83, *expresamente establece* que "[e]n el escrutinio general o recuento se actuará con relación a las papeletas no adjudicadas y las *protestadas* para determinar la validez o *nulidad* de éstas". (Énfasis suplido.) Es evidente que resulta totalmente incorrecta la aseveración de que el reglamento vigente no le confiere a la C.E.E. la facultad de anular papeletas que, alegadamente, contengan las iniciales del elector. De lo contrario, ¿qué sentido tendría someterlas a ese proceso y prohibir su adjudicación en el escrutinio original si, al fin y al cabo, ellas tienen que ser adjudicadas? "Es elemental el axioma de que la ley no puede exigir cosas inútiles ni absurdas." *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 444 (1980).

Tanto en el Reglamento Oficial de las Elecciones Generales de 1984 (Reglamento de Elecciones de 1984)[7] como en el actual, se dispone expresamente la nulidad de las papeletas iniciadas o marcadas. La variante en el reglamento actual, que sustituyó la palabra "nula" por "protestada", tiene el propósito de flexibilizar lo relativo a la anulación de esas papeletas, de suerte que en lugar de decretarse inflexible y absolutamente su nulidad en el escrutinio original, a ese nivel únicamente se protesten y se remitan dichas papeletas a la comisión en pleno para que sea ésta quien dilucide su adjudicación o rechazo. Así, se le ofrece la oportunidad a quien reclame su adjudicación a presentar prueba en favor de su reclamo. Nos parece plenamente justificable tal enmienda si se considera que la presencia de una marca o inicial en la papeleta no debía tener el efecto inmediato de destruir la validez del voto sin que antes se pasara juicio, por ejemplo, sobre si se trataba del tipo de marca que prohíbe la ley o si fue hecha por el elector[8] o por otra persona. De ahí que la ley y el reglamento vigentes dispongan que será protestada y establezcan un proceso para su examen o evaluación, luego de lo cual, una vez determinado que se trata de marcas indebidamente consignadas en la papeleta y que tienen el efecto de identificar o distinguir esa papeleta de las otras, se decrete su anulación. Lo anterior es cónsono con el

---

[7] El Reglamento Oficial de las Elecciones Generales de 1984, pág. 87, disponía lo siguiente:

"*R. 78 SERA NULA TODA PAPELETA:*

. . . . . . . .

c) que tenga escrito nombres o iniciales fuera de la columna de Nominación Directa, sean éstas al frente o al dorso de la papeleta, a excepción de lo que se expresa en las Reglas #79 y 80 que siguen, o que sean las iniciales requeridas en este Reglamento a los inspectores del colegio."

[8] No está en controversia en este caso que, en efecto, fueron los electores quienes hicieron tales marcas o iniciales. La alegación principal de los peticionarios es en el sentido de que los electores estaban facultados para ello y que la comisión carecía de facultad para anular sus papeletas.

proceso de evaluación establecido por ley y con la facultad expresa concedida a la comisión de rechazar o anular esas papeletas. Obsérvese que tan evidente resulta la facultad de la comisión de anular este tipo de papeletas que en el "Manual ilustrado de los procedimientos en los colegios de votación y las unidades electorales" (Manual) de 8 de noviembre de 1988, pág. 8, al hacerse referencia a las marcas que *invalidan* la papeleta, se incluyen las protestadas por marcas o iniciales del elector. Véase Apéndice I, pág. 1. La interpretación que evidencia dicho manual, *adoptado unánimemente por todos los partidos*[9] antes de las elecciones, nos merece mayor confiabilidad que la adelantada por el peticionario, que contradice, después de conocer el contenido del voto, la interpretación que adoptó antes de los comicios.

Por otra parte, nótese que no es sólo en Puerto Rico donde se anulan las papeletas que contengan marcas o iniciales.

Numerosas jurisdicciones estatales de Estados Unidos se han pronunciado a favor de la invalidez de papeletas electorales cuando las mismas contengan marcas o iniciales que tengan el propósito de distinguir o de identificar al elector. En *Griffin v. Rausa*, 118 N.E.2d 249 (1954), la Corte Suprema de Illinois resolvió, ratificando jurisprudencia anterior, que cualquier marca hecha por el elector sobre la papeleta con el fin de identificarse anula la misma aun cuando la intención del elector de votar por determinado candidato fuere clara. Añadió que la determinación de lo que consti-

---

(9) El "Manual ilustrado de los procedimientos en los colegios de votación y las unidades electorales" de 8 de noviembre de 1988 fue aprobado por unanimidad por los comisionados de los tres (3) partidos políticos. No puede ahora el peticionario hacer caso omiso a ese manual, pues "por regla general, entonces, un comisionado no puede desentenderse y hacer caso omiso de los acuerdos y reglas válidas adoptadas previamente por unanimidad". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 410. Véase que no se trata de una regla que admita interpretaciones *bona fide* diversas. El término "invalidan" sólo admite una interpretación.

tuye una marca con el propósito de identificarse es una cuestión de hecho a ser determinada de una *inspección* de la misma papeleta. En *Sims v. George*, 236 N.E.2d 820 (1968), la Corte Suprema de Indiana, en virtud de la Ley Electoral de dicho estado, anuló ciertas papeletas que contenían iniciales o marcas capaces de identificar a los electores. En *Parker v. Hughes*, 67 P. 637 (1902), el Tribunal Supremo de Kansas determinó que las papeletas en las cuales el elector había hecho cualquier clase de marca capaz de identificarlo debían ser anuladas, aun cuando la Ley Electoral de ese estado no proveía específicamente la anulación de éstas. Véase, además, *Angelle v. Angelle*, 204 So. 2d 581 (1967); *McGee v. Fuselier*, 330 So. 2d 383 (1976); *Brunet v. Evangeline Parish Bd. of Sup'rs*, 379 So. 2d 271 (1979); *In re Recount of Ballots Cast in General Election*, 325 A.2d 303 (Pa. 1974); *In re Contest of 1979 General Election, etc.*, 414 A.2d 310 (Pa. 1980); *Beck v. Cousins*, 106 N.W.2d 584 (1960); *Frakes v. Farragut Community School District*, 121 N.W.2d 636 (1963); *Devine v. Wonderlich*, 268 N.W.2d 620 (1978); *Hodgson v. Knoblauch*, 109 N.E. 338 (1915); *Elwell v. Comstock*, 109 N.W. 698 (1906); *Dennis v. Caughlin*, 41 P. 768 (1895).

En resumen, consistentemente se ha sostenido la invalidez o nulidad de papeletas electorales que contengan iniciales, firmas o cualquier tipo de marcas diferentes a las permitidas por ley para emitir el voto cuando ello tenga el efecto de identificar o de distinguir dicha papeleta de las otras. El fundamento que ha permeado dichas decisiones es evitar la coacción, la intimidación, el soborno o cualesquiera otras prácticas corruptas que tiendan a minar la pureza del proceso electoral y la libertad del elector al emitir su voto.

### III

Si bien el voto está resguardado por una presunción de validez y de legalidad, *P.P.D. v. Admor. Gen. de Elec-*

*ciones*, 111 D.P.R. 199 (1981), esa presunción no es pertinente al caso que nos ocupa. Obviamente, tal presunción se refiere a aquel voto emitido de modo regular, donde prima facie se haya acatado la ley. Mas cuando de la propia faz de la papeleta surge que la misma contiene alguna irregularidad que contraviene la ley y los reglamentos aplicables, no es procedente invocar dicha presunción. No se puede presumir lo que la simple vista niega. En estos casos la propia papeleta evidencia la irregularidad. Por lo tanto, es sobre el elector que recae el peso de la prueba en este caso. Le corresponde a éste demostrar que actuó de buena fe y que fue inducido a error por la orientación confusa de los funcionarios de colegio. Ello fue precisamente lo que los peticionarios declinaron hacer en la vista de este caso en el Tribunal Superior al renunciar a presentar prueba.

Resultaría, por otra parte, improcedente colocar sobre la comisión el peso de la prueba en los casos en que se invaliden o se anulen papeletas por el fundamento en cuestión, puesto que ello podría requerir de la C.E.E. tener que descorrer el velo de secretividad que cubre el ejercicio del voto de aquellos electores cuyas iniciales puedan ser compatibles con las que aparezcan en las papeletas. ¿Cómo saber si las iniciales J.P.R. estampadas en una papeleta corresponden a Juan Pérez Rodríguez o a José Pagán Rivera, o a cualquier otra persona con tales iniciales? Eso sólo lo conoce la persona que estampó las iniciales y aquella a quien podría ir dirigido el mensaje. De manera que, si se interpretara que el modo legal y constitucional de anular un voto *por este fundamento* es mediante la concesión de unas garantías procesales previas al elector cuyo voto fuera a anularse, tales como citación, oportunidad de ser oído, pruebas caligráficas, etc., tendrían que ser citados e interrogados todos los electores de ese colegio; no sólo aquellos cuyos nombres puedan responder a las iniciales contenidas en la papeleta. Considérese que

cualquier persona en el colegio pudo haber hecho marcas o iniciales en su papeleta aun cuando su nombre no concuerde con las mismas. Ello acarrearía, obviamente, el peligro de la pérdida de la secretividad del voto de esos electores. Por lo complicado y prolongado de la pesquisa podría hacerse inoperante la protección a la secretividad que garantiza la ley.

De ahí que el elector o partido que impugne dicha anulación es al que le corresponde establecer o probar lo que a bien tenga para sostener o restituir la validez de su voto. Precisamente por estas mismas razones resultaría igualmente improcedente imponer sobre la comisión el peso de la prueba en casos en los que un partido o un elector alegue fraude. El elector o el partido que lo alegue tiene el peso de probarlo con evidencia sólida, clara y convincente. Lo anterior está predicado en el principio jurídico de que el fraude no se presume. *González v. Rivera*, 42 D.P.R. 313 (1931); *Monclova v. Financial Credit Corp.*, 83 D.P.R. 770 (1961); *Banco Crédito v. Chico Sagastibelza*, 90 D.P.R. 125, 134 esc. 10 (1964); *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 223 esc. 22. En este caso la C.E.E. no anuló las papeletas bajo el fundamento de fraude. Las mismas fueron anuladas porque los electores incumplieron con las disposiciones electorales aplicables que, en previsión del fraude, prohíben hacer marcas o iniciales en las papeletas. Si tales iniciales se hicieron con propósitos fraudulentos o sencillamente porque el elector prefirió emitir su voto de esta manera, o porque fue inducido a error, lo desconoce la C.E.E. y los tribunales. La C.E.E. actuó a base de una violación *prima facie* de la ley electoral y su reglamento.

Además, el derecho al voto, no empece su gran preeminencia, no tiene credenciales de inimpugnabilidad. La Legislatura tiene la facultad de regular el ejercicio de ese derecho y todo lo concerniente al proceso electoral. Art. VI,

Sec. 4 y Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1; *P.S.P. v. Com. Estatal de Elecciones*, supra. Precisamente, el legislador, en el Art. 5.028 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3231, dictaminó que la "Comisión Estatal de Elecciones dispondrá, mediante reglamento, la forma en que los electores marcarán sus papeletas a propósito de consignar en ellas su voto". Siguiendo esa encomienda, la Regla 46 del Reglamento de Elecciones de 1988 estableció las formas y maneras mediante las cuales los electores deberán votar. "La ignorancia de las leyes no excusa de su cumplimiento." 31 L.P.R.A. sec. 2.

▮▮▮ Por tanto, ese derecho tiene que ejercitarse dentro de los parámetros de las leyes y los reglamentos aplicables, y no de manera anárquica o de acuerdo con el parecer de cada elector. Máxime cuando se trata de legislación que, lejos de obstruir u obstaculizar el ejercicio del derecho al voto, promueve su protección, sobre todo el ejercitarlo de manera voluntaria y libre de toda coacción. De modo que cuando el elector no proceda conforme a la ley, ese voto legítimamente puede impugnarse y, de corroborarse la violación a la ley, anularse. En el caso de autos se ha alegado que algunos electores consignaron sus iniciales en la papeleta inducidos por los funcionarios de colegio que les instruyeron en esa dirección. Sin embargo, al celebrarse la vista en el tribunal de instancia para dilucidar este punto, los demandantes, después de comenzar a interrogar a su propio testigo sobre este particular y éste indicar que "no le podía dar al Tribunal *ninguna información en cuanto a qué había ocurrido*" (énfasis suplido), optaron por no presentar prueba, sometiendo el caso por las cuestiones de derecho. Sentencia, pág. 5.

▮▮▮ Téngase en mente que el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, le impone

la obligación al Tribunal Superior de celebrar vista en su fondo, *recibir evidencia y hacer sus propias determinaciones de hecho y conclusiones de derecho al revisar las decisiones de la C.E.E.* No se trata, por lo tanto, de una mera revisión limitada a cuestiones de derecho. Se trata en realidad de un juicio *de novo.* Véase *Vélez Quiñones v. Srio. de Instrucción,* 86 D.P.R. 755 (1962). Este momento era apropiado y oportuno para que los peticionarios presentaran prueba sobre las alegaciones en cuestión, incluso evidencia que no fue presentada ante la C.E.E. Sin embargo, como ya señalamos, ello no se hizo. Ante tal situación no se pueden dar por probadas tales instrucciones. Debe inferirse que los recurrentes no contaban con prueba alguna para sustentar sus alegaciones, no solamente en cuanto a las trescientas cincuenta y siete (357) papeletas anunciadas, sino ni siquiera en cuanto a las diez (10) papeletas que acompañó a su solicitud. Adviértase que esas papeletas que se acompañaron como parte de las alegaciones corresponden a distintos colegios. De ellas no surgen las instrucciones que se alegan impartieron en relación con cada uno de esos votos. Las alegaciones tienen que ser probadas, puesto que ellas de por sí no hacen prueba. Adviértase que el peticionario, en la vista celebrada, anunció que presentaría en evidencia esas trescientas cincuenta y siete (357) papeletas y el testimonio de cerca de cuarenta (40) testigos, lo que luego no hizo. Tampoco puso a disposición de la otra parte esa prueba. Debe presumirse que la misma le hubiese resultado adversa. Regla 16(5) de Evidencia, 32 L.P.R.A. Ap. IV.

■ Por otra parte, no es esto materia o asunto del cual se pueda tomar conocimiento judicial. La Regla 11 de Evidencia, 32 L.P.R.A. Ap. IV, establece las circunstancias o los hechos de los cuales pueden tomar conocimiento judicial los tribunales. Dispone esta regla, en lo pertinente, lo siguiente:

*Regla 11. Conocimiento judicial de hechos adjudicativos*

(A) Los tribunales podrán tomar conocimiento judicial de hechos que no son razonablemente objeto de controversia por:

(1) Ser de conocimiento general dentro de la jurisdicción territorial del tribunal, o

(2) ser susceptibles de determinación inmediata y exacta recurriendo a fuentes cuya exactitud no puede ser razonablemente cuestionada. 32 L.P.R.A. Ap. IV, R. 11.

 De entrada, los hechos que nos ocupan en este caso están en controversia. No hay acuerdo o consenso entre las partes respecto a que los funcionarios de colegio impartieran a los electores las instrucciones del modo que alegan los peticionarios, ni siquiera que impartieran instrucciones algunas. Tampoco se cumple con las circunstancias específicas contenidas en los incisos de la regla antes citada.

 En lo que concierne al primer inciso, es de rigor reconocer que las particulares instrucciones que alegan haber recibido un grupo de electores en algunos colegios no constituyen un hecho de conocimiento general, sobre todo cuando no existe evidencia en el sentido de que la mayoría de los electores que votaron en dichos colegios iniciaràn sus papeletas. Las alegadas instrucciones particulares no las conoce el tribunal de instancia ni este Tribunal, ni son de conocimiento general del pueblo de Puerto Rico, y según la prueba testifical que comenzó a desfilar antes de la renuncia a presentar prueba, ni aun las conocía el propio Comisionado Electoral Alterno del peticionario P.N.P. Es a hechos o a información de clara notoriedad y de conocimiento público a lo que se refiere este inciso. Véanse: E.L. Chiesa, *Práctica Procesal Puertorriqueña, Evidencia,* San Juan, Pubs. J.T.S., 1979, Vol. I, Cap. II, pág. 28; *Moa v. E.L.A.,* 100 D.P.R. 573 (1972); *Lluberas v. Mario Mercado e Hijos,* 75 D.P.R. 7, 19–20 (1953). En consecuencia, no podemos tomar conocimiento judicial de esas instrucciones, máxime cuando se trata de errores no generalizados, puesto que de mil tres

(1,003) colegios de votación que había en San Juan, sólo en un reducido grupo de ellos se registraron papeletas iniciadas y respecto a una significativa minoría de electores. Además, no existe alegación ni prueba referente al número de colegios en que, alegadamente, se dieron tales instrucciones.

■ Tampoco tiene aplicación a este caso el segundo inciso, particularmente si observamos el lenguaje claramente restrictivo del mismo. Nótese que este inciso requiere que se trate de hechos susceptibles de determinación *inmediata* y *exacta* recurriendo a fuentes cuya *exactitud* no puede ser razonablemente cuestionada. En primer término, los hechos en cuestión no son susceptibles de determinación inmediata, puesto que no se trata meramente de identificar unos colegios en los que se alega se impartieron instrucciones confusas, sino que sería necesario interrogar a los funcionarios que en ellos laboraron y a los electores que, alegadamente, recibieron tales instrucciones.

■ En segundo lugar, es dudoso que se cuente en este caso con fuentes cuya exactitud no pueda ser razonablemente cuestionada. Es preciso notar que por tratarse del sistema de colegio abierto las instrucciones se repiten durante todo el tiempo en que fluyen los electores al colegio de votación. Así que lo que realmente se pretende es tomar conocimiento judicial de las comunicaciones orales que ocurrieron entre personas en algunos colegios en distintos momentos durante el día de las elecciones. Ni aun contestes todos los funcionarios de colegio en cuanto a la información ofrecida a los electores procedería catalogarse esta fuente como razonablemente incuestionable. En algunos casos incluso podría haber honestas discrepancias respecto a la interpretación que pueda aplicarse a esas instrucciones. Este inciso lo que autoriza es tomar conocimiento judicial de asuntos o datos de

fácil acceso o corroboración como, por ejemplo, los récord o autos de los casos presentados en los tribunales. Chiesa, *op. cit.*, pág. 34.

■■ No procede el conocimiento judicial de hechos adjudicativos a base de vagas inferencias que toleran razonablemente distintas conclusiones. Frente a esa situación, el tribunal de instancia desestimó la demanda. Como puede notarse, carecía de evidencia que sustentara las alegaciones.

■■■ Tampoco hubiera podido dicho tribunal descansar en las declaraciones juradas, si se le hubiesen presentado, pues ellas constituyen prueba de referencia. Nuestro derecho evidenciario define el concepto "prueba de referencia" como una "declaración aparte de la que hace el declarante al testificar en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". 32 L.P.R.A. Ap. IV, R. 60. El término "declaración" incluye aseveraciones tanto orales como escritas. Como regla general, la prueba de referencia no se admite en evidencia. 32 L.P.R.A. Ap. IV, R. 61. Aunque las reglas disponen varias excepciones a esa regla general, las declaraciones juradas no están previstas en ninguna de ellas. Tampoco debe entenderse incluida entre las cláusulas residuales. 32 L.P.R.A. Ap. IV, R. 64(B)(5) y 65(W). Véanse: T. González, *Excepciones residuales de las Reglas de Prueba de Referencia*, LVI (Núm. 4) Rev. Jur. U.P.R. 611, 617 (1987); Chiesa, *op. cit.*, Cap. VIII, pág. 361. Esta regla de exclusión está primordialmente fundada en la ausencia de garantías circunstanciales de confiabilidad y exactitud, y en el hecho de que la persona que hace la aseveración no está disponible para ser contrainterrogada.[10] Ello

---

[10] En *Pueblo v. García Reyes*, 113 D.P.R. 843, 852–853 (1983), se sostuvo que las declaraciones que constituyen prueba de referencia deberían ser tomadas con cautela, ya que la misma acarrea riesgo con respecto a: (1) la narración del

lesiona, además, el derecho que tienen las partes de confrontarse con la prueba en su contra, lo cual si bien no nace en este caso del derecho constitucional al careo que tienen los acusados de delito, puesto que este es un procedimiento de naturaleza civil, el mismo forma parte del debido proceso de ley procesal que tiene cualquier parte en un procedimiento judicial. *Ortiz Cruz v. Junta Hípica*, 101 D.P.R. 791, 795 (1973).

■ Como puede observarse, las declaraciones juradas en este caso menoscaban el derecho de la parte que sostiene la posición contraria de enfrentarse a esa prueba, contrainterrogar a los testigos y a que el juez observe su comportamiento en la silla testifical. Las mismas, por lo tanto, son inadmisibles en el caso de autos como prueba sustantiva.

## IV

■ A tenor con lo antes indicado, correspondía a las partes presentar su prueba ante el Tribunal Superior, cosa que no hicieron. No es ante este Foro que procedía presentar dicha prueba. Nuestra función revisora de las determinaciones del Tribunal Superior se *limita únicamente a cuestiones de derecho.* Así lo preceptúa expresamente el Art. 1.017 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016b, al señalar lo siguiente:

> Cualquier parte afectada por una decisión del Tribunal Superior podrá radicar un recurso de Revisión fundamentado en *cuestiones de derecho* ante el Tribunal Supremo de Puerto Rico, dentro de los diez (10) días siguientes a la notificación de la misma. (Énfasis suplido.)

■ Resulta de rigor destacar que desde el año 1903 (*Cayol v. Balseiro y Georgetti*, 3 D.P.R. 178 (1903)) hemos

---

evento; (2) la percepción; (3) el recuerdo del evento, y (4) la sinceridad del declarante.

repudiado reiteradamente la práctica, en que incurre en este caso el peticionario, de presentar ante este Tribunal prueba o documentación que no fue presentada ante el tribunal de instancia.

En *Belmonte v. Mercado Reverón, Admor.*, 95 D.P.R. 257, 263–264 (1967), expresamos que constituye una práctica indeseable el que un recurrente ante este Tribunal, al presentar una solicitud de revisión, la acompañe de documentos que no tuvo ante sí el tribunal de instancia. Este Tribunal no podrá tomar en consideración ninguno de dichos documentos. *E.L.A. v. Mercado Carrasquillo*, 104 D.P.R. 784 (1976); *Matos v. P.R. Ry., Lt. & P. Co.*, 58 D.P.R. 160 (1941); *Collazo Vda. Texidor v. Pueblo*, 46 D.P.R. 164 (1934); *Casalduc et al. v. La Compañía Trasatlántica de Hamburgo*, 9 D.P.R. 350 (1905). Además, hemos reglamentado este asunto en la Regla 34(c) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A.

En lo que concierne al caso de autos, nos referimos particularmente a declaraciones juradas y papeletas que, sin explicación alguna, se han presentado ante este Tribunal y que no fueron presentadas ante el tribunal a quo. Resulta particularmente repudiable y censurable esta práctica cuando, como aquí, advertido el peticionario por el tribunal de instancia de sus consecuencias, le anunció y ratificó a éste que "sometía el caso completo sin evidencia de clase alguna" (sentencia, pág. 6), y cuando las declaraciones juradas que se traen ante este Tribunal, *sin hacer advertencia alguna de que no fueron presentadas en instancia*, constituyen, como antes indicamos, el más claro caso de prueba de referencia.

Ante la ausencia de prueba y la improcedencia de tomar conocimiento judicial como cuestión de derecho, no procedía validar las papeletas aludidas y la desestimación de este caso constituyó un dictamen correcto por parte del tribunal de instancia.

■ Una consideración final. Resulta de difícil explicación, en un caso de la importancia y posible trascendencia pública como la de éste, el cúmulo de anomalías en que han incurrido los abogados de los recurrentes. Como hemos señalado antes en esta opinión y aquí resumimos: (a) incumplen con las Reglas Aplicables a los Recursos para la Revisión de Decisiones Administrativas ante el Tribunal Superior, 4 L.P.R.A. Ap. VIII-A; (b) anuncian que el caso "está motivado por 357 papeletas municipales" que no presentan en evidencia; (c) anuncian que cuentan con cerca de cuarenta (40) testigos y sólo presentan uno (1) que comparece, *como testigo del peticionario, el cual "no le podía dar al Tribunal ninguna información en cuanto a qué había ocurrido* en aproximadamente las dos terceras partes de las papeletas así examinadas, pues no aparecía en las mismas anotación de clase alguna que permitiera formar una conclusión sobre el particular, y que con relación a la otra tercera parte de las examinadas podría decirle al Tribunal que el trámite administrativo no había sido agotado y que las papeletas no habían llegado al nivel de una decisión por la Comisión Estatal de Elecciones en propiedad" —(énfasis suplido) sentencia, pág. 5—; (d) renuncian a presentar la prueba documental y testifical que habían anunciado después de advertidos de su efecto, y sometieron el caso completo sin evidencia alguna; (e) cuando recurren a este Tribunal, incumplen con el reglamento e impropiamente, y sin explicación alguna, intentan traer ante la atención del Tribunal prueba que no habían presentado en instancia, la cual para colmo constituye prueba de referencia.

Todo lo anterior nos obliga a preguntarnos si ello es producto del desgano que produce la falta de convicción profesional o del avalamiento pro forma de unas expresiones públicas. Sea cual fuere el caso, la situación amerita que llamemos la atención de los abogados del peticionario a las obli-

gaciones que les impone la Regla 9 de Procedimiento Civil, 32 L.P.R.A. Ap. III, y los cánones de ética profesional.

En resumen, resolvemos:

1. Que el derecho constitucional al voto, aunque fundamental, no es absoluto. Puede ceder ante intereses públicos mas apremiantes, como es el de mantener la secretividad del sufragio, en previsión de coacciones o presiones indebidas contra el elector.

2. Que nuestro derecho electoral dispone que las papeletas marcadas o iniciadas serán protestadas y que una vez la comisión en pleno las examine y decida que las mismas pueden tener el efecto de identificar al elector puede anular las mismas.

3. Que la presunción de validez y corrección de la que goza el derecho al voto queda destruida cuando de la propia faz de la papeleta surge que el elector emitió su voto de modo irregular, en violación prima facie de la Ley Electoral de Puerto Rico.

4. Que es a quien alegue la validez de papeletas así marcadas a quien le corresponde el peso de la prueba para sustentar su alegación. Ello en vista de que la C.E.E., al decretar la nulidad de esos votos, actúa por mandato de la legislación y reglamentación electoral aplicable, y que colocar sobre la comisión el peso de la prueba *en estos casos*, además de impráctico, podría acarrear el peligro de la pérdida de la secretividad del voto para todos los electores del colegio.

5. Que es materia de prueba, y no de la cual se pueda tomar conocimiento judicial, las particulares razones en función de las cuales un elector ha marcado o iniciado su papeleta a fin de juzgar su motivación al incurrir en esa práctica.

6. Que es repudiable y censurable presentar ante este Tribunal prueba que no fue presentada en el tribunal de instancia.[11]

Considerado el recurso como una solicitud de revisión, y habiendo comparecido las partes en virtud de la Regla 50 del Reglamento de este Tribunal, 4 L.P.R.A. Ap. I-A, por los fundamentos expuestos en esta opinión *se expedirá el auto y se dictará sentencia que confirme la emitida por el tribunal de instancia.*

El Juez Asociado Señor Negrón García emitió opinión disidente, a la cual se une el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Ortiz no intervino.

---

[11] Nuestro análisis no descansa en las interpretaciones de la ley que erróneamente puedan haber hecho las partes o el presidente de la C.E.E., sino en *nuestra propia interpretación del derecho aplicable.*

Por prudencia judicial, en esta opinión no tratamos el tema de la certificación del candidato a Alcalde de San Juan, pues ello no está ante nos y, además, es objeto de un pleito separado presentado y pendiente de dilucidarse ante el Tribunal Superior.

También ignoramos la aspersión de tinte personal que se pueda deducir se nos hace, puesto que no nos parece propio atender tales asuntos en una opinión del Tribunal.

# CRITERIOS PARA LA ADJUDICACIÓN DE PAPELETAS:

El criterio rector que debe prevalecer al adjudicar una papeleta es: respetar al máximo la intención del elector. (R. 72)

## Marcas válidas:

Se consideran marcas válidas cualquier tipo de marca tales como: una cruz: X, marca de cotejo: ✓, línea: ——, línea vertical, círculo grande o pequeño: ◯ o, ó punto (•) si no hubiere otra marca en la papeleta.

La R. 79 dispone que también se considerarán marcas válidas las siglas de los partidos: PPD, PNP y PIP; las iniciales y los nombres de los candidatos a gobernador, tales como: RHC, BCR, RBM, Rafael, Baltasar y Rubén, cuando dichas marcas aparezcan en el cuadrante de las insignias de los partidos correspondientes.

**Ejemplos de marcas válidas:**

 

Fig. 27 Fig. 28 Fig. 29

(Nota importante: Se advierte que NO se promueva el escribir iniciales o nombres porque los electores pueden dañar las papeletas y peligar el voto. Los ejemplos se ilustran sólo para que se conozca cómo adjudicar estos casos.)

## MARCAS QUE INVALIDAN LA PAPELETA: (estén en su faz o al dorso)

Las papeletas serán "protestadas" y no-adjudicadas si contienen otros nombres, iniciales, dibujos, frases, motes o sobrenombres, a menos que sean nombres en la columna de nominación directa ("write-in"). (R. 78) También será protestada toda papeleta votada bajo dos (2) ó más partidos o que tenga arrancada la insignia de algún partido. Ejemplos:

Fig. 30 31 34
Fig. 31 33 35
Fig. 36 Fig. 37

## —O—

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Asociado Señor Rebollo López.

Puerto Rico no es Macondo, aunque a veces nuestra realidad cotidiana nos enfrenta a situaciones que parecen derivadas de ese mundo de fantasía de la vena creadora de García Márquez.(1) Ello implica que el sistema de justicia no puede responder a esa interpretación mágica. No podemos cerrar los ojos y separar la realidad de la justicia. "Los derechos se plasman y cobran vida en la realidad y no en los documentos expositivos de las leyes y reglamentos." *Rivera v. Gobernador*, 121 D.P.R. 558, 564 (1988). Es absurdo, irónico y paradójico que, so pretexto de proteger al elector de que "se conozca su tinte político cuando ejerce su voto" (opinión mayoritaria, pág. 13 esc. 4), la mayoría del Tribunal Supremo *ANULE EL MISMO*. En respeto al sufragio *universal*, nuestra voluntad y conciencia judicial no ha de responder exclusivamente a ese Macondo de la literatura suramericana. De hacerlo, asestaríamos un golpe mortal al corazón de nuestra democracia. Lamentablemente, en materia normativa de sufragio electoral, la decisión que hoy emite el Tribunal es un paso retrógrado que pertenece a la categoría de "derecho cardíaco".(2)

Al cabo de ocho (8) años, atendemos otra vez una sensible y meritoria controversia producto de la "circunstancia de que en el sistema de colegio abierto, en contraste con el ce-

---

(1) Expresamente nos referimos a su obra *Cien Años de Soledad*, 16ta ed., Buenos Aires, Ed. Sudamericana, 1970, expositiva de las circunstancias habidas en el proceso de votación y conteo de unas papeletas colores rojo y azul en una elección local.

Si descodificamos y apreciamos adecuadamente el metalenguaje de esta novela, de seguro concluiremos que el autor jamás pretendió, a título de "universalidad", que Macondo se convirtiera en el paradigma a imitar.

(2) Expresión original de Carlos Raúl Sanz, *Sobre el Derecho y el Proceso*, 1983-B Rev. Jur. Arg. La Ley 873, 884 (1983).

rrado, *no existe la oportunidad para que se impartan ins-*
*trucciones generales y comunes a todos los electores de*
*cómo [(formas de)] votar . . . .* (Énfasis suplido.) *P.S.P. v.*
*Com. Estatal de Elecciones,* 110 D.P.R. 400, 433 (1980). A tal
efecto, al igual que en el pasado, "[t]omamos conocimiento
judicial" de varias fallas habidas en las recientes elecciones.
Íd., pág. 423.

Varios principios —incorporados hace tiempo a nuestro
repertorio jurisprudencial— apuntalan este disenso. *Pri-*
*mero,* las elecciones se ganan o se pierden contando —no
anulando— votos. *Segundo,* existe —o al menos existía—
una tendencia judicial de superar escollos en la dinámica del
sufragio electoral. *P.S.P. v. Com. Estatal de Elecciones,* su-
pra. *Tercero,* debemos cumplir con el mandato fundamental
de que sólo "'. . . se declarará electo aquel candidato para un
cargo que obtenga un *número mayor de votos* que el obte-
nido por cualquiera de los demás candidatos para el mismo
cargo' (énfasis nuestro), Art. VI, Sec. 4, Constitución
E.L.A. . . .". *P.P.D. v. Admor. Gen. de Elecciones,* 111 D.P.R.
199, 320 (1981), opinión concurrente del Juez Asociado Señor
Negrón García. Y *cuarto,* el Poder Judicial no puede endosar
interpretaciones restrictivas ni refrendar determinaciones
administrativas confiscatorias del derecho al voto fundados
en "normas, trámites y prácticas laxas de los funcionarios
que en materia electoral están directamente encargados de
conducir y vigilar en el día de las elecciones su impl[a]nta-
ción". Íd., págs. 323–324.

Al hacerlo nos anima el pensamiento vocacional de que la
"lógica jurídica no se puede desconectar de los factores hu-
manos y circunstancias personales de los encargados de apli-
car la Ley. La objetividad debe ser entendida debidamente,
pues ésta no se pierde al actuar al calor de la llama que en-
ciende el sentimiento de justicia. *Un protagonista del Dere-*
*cho no puede permanecer insensible como mero espectador*
*ante el drama que punza e incide en la intimidad de las*

*conciencias que han de sobreponerse a los avatares y varia-
ciones que la vida presenta, sabiendo reaccionar, en cada
caso, en la forma que la Ley exige con tal de ver implantado
en la sociedad un orden fundado en la Justicia".* (Énfasis
suplido.) C. Onecha Santamaría, *La Vocación Jurídica,* XCV
(Núm. 1) Rev. Gen. Leg. Jur. 5, 14–15 (1987).

## I

El Partido Nuevo Progresista (P.N.P.) cuestiona la sen-
tencia del Tribunal Superior, Sala de San Juan (Hon. Ángel
G. Hermida, Juez), de 6 de diciembre de 1988, que desestimó
la revisión interpuesta contra la Comisión Estatal de Elec-
ciones. El acuerdo impugnado, de 17 de noviembre de 1988,
fue adoptado por su Presidente, Lcdo. Marcos Rodríguez
Estrada, y los Lcdos. Eudaldo Báez Galib e Hiram Meléndez
Rivera, Comisionados Electorales del Partido Popular De-
mocrático (P.P.D.) y Partido Independentista Puertorri-
queño (P.I.P.), respectivamente, con el voto en contra del Co-
misionado Electoral del P.N.P., Francisco González, Jr. El
mismo *anuló* "el voto de un número de papeletas que conte-
nían las iniciales del elector en la parte posterior de las
mismas. El número de papeletas en controversia —a nivel
del Tribunal Superior— asciend[e] a diez, de las cuales tres
(3) votos fueron emitidos a favor del Partido Popular Demo-
crático y siete (7) votos a favor del Partido Nuevo Progre-
sista . . .". Alegato del correcurrido, págs. 1–2.

Luego de escuchar los argumentos de todas las partes
—al abstenerse el P.N.P. de presentar en ese momento evi-
dencia en apoyo de su posición— sometió su recurso como
una cuestión pura de derecho. El ilustrado foro de instancia,
en detallado dictamen,[3] decretó que el acuerdo de la Comi-

---

[3] En su sentencia desestimatoria, el tribunal de origen hizo claro que no
expresaba opinión de clase alguna en cuanto al derecho que pudiese tener cual-

sión Estatal de Elecciones era válido y se hizo conforme la Regla 78 del Reglamento Oficial de las Elecciones Generales de 1988 (Reglamento de Elecciones de 1988).

## II

Antes que todo, debemos aclarar que carece de mérito el argumento levantado en instancia por el P.P.D. en su oposición —que la mayoría del Tribunal recoge en el esc. 8 (opinión mayoritaria, pág. 25)— en el sentido de que el P.N.P. está impedido judicialmente de cuestionar la anulación de las papeletas. Se funda en que su Comisionado Electoral, señor González, Jr., votó *antes* en la Comisión Estatal de Elecciones a favor de la aprobación del reglamento que rige las elecciones de 1988, y del "Manual ilustrado de los procedimientos en los colegios de votación y las unidades electorales" (Manual) de 8 de noviembre de 1988, y que fue en virtud de éstos que se tomó la decisión de protestar y anular las papeletas.

El señalamiento no es novel. En *P.S.P. v. Com. Estatal de Elecciones*, supra, fue esgrimido *contra* el entonces Comisionado Electoral del P.P.D., Lcdo. Héctor L. Acevedo —y rechazado por este Foro— cuando éste impugnó un acuerdo sosteniendo, durante el escrutinio, la nulidad de unos votos fuera del cuadrante del símbolo de su partido en la papeleta ("pavazos"). Allí resolvimos que, por regla general, "un Comisionado no puede desentenderse y hacer caso omiso de los acuerdos y reglas *válidas* adoptadas previamente por unanimidad". (Énfasis suplido.) Íd., pág. 410. Ahora bien, dicho funcionario no está impedido si hay "discrepancias *bona fide* sobre la interpretación o alcance de una regla o acuerdo así aprobado . . .". Íd. Además, la regla general sufre la excep-

quier candidato a elección de impugnar la certificación de cualquier otro candidato, según el trámite establecido en el Art. 6.014 de la Ley Electoral de Puerto Rico vigente, 16 L.P.R.A. sec. 3274.

ción ante señalamientos de que la reglamentación es nula por estar en conflicto con la Ley Electoral de Puerto Rico o con la Constitución. Íd. Contra el uso lícito de esa prerrogativa de un Comisionado Electoral no pueden oponerse obstáculos fundados en que el recuento está en una etapa adelantada; ello retrasaría la certificación de candidatos. No puede haber certificación válida hasta que finalice el recuento de todos los votos. *P.P.D. v. Barreto Pérez*, 110 D.P.R. 376 (1980).

Reafirmamos esos pronunciamientos. No existe fundamento jurídico válido para variarlos. No podemos olvidar que los representantes de los partidos políticos en la Comisión Estatal de Elecciones responden exclusivamente a los intereses de sus respectivas colectividades políticas, y no necesariamente a los de los electores individuales. De ninguna manera la participación de los partidos políticos, aun unánime, en los asuntos del organismo puede comprometer o perjudicar los derechos fundamentales de los ciudadanos. Mucho menos si tales derechos, como en el caso de autos, son de estirpe constitucional.

> El sujeto principal de la arquitectura moderna constitucional-electoral tutelado es el elector individual. El partido no es el elemento ultimador, sino un vehículo de expresión individual que se suma a otros para resultar y viabilizar la expresión colectiva ciudadana. Así, toda ley de actualidad regulatoria de la franquicia electoral se ha encaminado hacia el reconocimiento de la "prevalencia de los derechos electorales del ciudadano *sobre los derechos* y prerrogativas de *todos* los partidos y agrupaciones políticas". (Bastardillas nuestras.) Art. 2.001(11) (16 L.P.R.A. sec. 3051(11)). *Al final de cuentas, este derecho individual es el verdadero destinatario y receptor del sistema, por lo cual es de incuestionable interés público salvaguardarlo contra las posibles injusticias que de vez en cuando el choque de intereses de los partidos puede generar.* (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 407.

Un esquema estatutario en contrario tendría que partir de la errónea premisa de que todos los ciudadanos pertene-

cen necesariamente a un partido político y que, en múltiples circunstancias, no tienen contradicciones antagónicas con éstos.

Además, ignoraría que aunque todo reglamento comicial persigue hacer viable las disposiciones de la Ley Electoral de Puerto Rico, aquél tiene un lugar inferior en la jerarquía normativa. Debe ceder cuando conflige impermisiblemente con normas estatutarias, jurisprudenciales o constitucionales.

En resumen, la "prerrogativa de los Comisionados Electorales de adoptar cualesquiera acuerdos fundamentados en la regla especial de mayoría o de unanimidad absoluta, no es irrestricta. Tiene las limitaciones naturales 'dimanantes de la Constitución, o de la Ley . . .'. *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 412". *P.N.P. y P.I.P. v. Rodríguez Estrada*, 122 D.P.R. 490, 515–516 (1988), opinión concurrente del Juez Asociado Señor Negrón García. *Tal es la situación de autos.*

## III

En el foro de instancia y ante nos, el Presidente de la Comisión Estatal de Elecciones *acepta* que la "*Ley Electoral no dispone específicamente la nulidad de un voto a base de los hechos alegados...*". (Énfasis suplido.) Alegato del correcurrido, pág. 5. Sin embargo, nos pide la desestimación del recurso a base de que "[p]rocede aplicar la letra de ley que es clara, y que ordena la [a]nulación de las papeletas en cuestión". Moción solicitando desestimación, pág. 3. Esta última postura —reiterada en su oposición— de su faz contradictoria, es totalmente errónea e improcedente en derecho. Nos explicamos.

Al igual que en el pasado, el Art. 1.003(36) de la Ley Electoral de Puerto Rico vigente, 16 L.P.R.A. sec. 3003(36), define genéricamente como *papeleta protestada* la que "contenga iniciales, palabras, marcas o figuras de cualquier clase

que no fueren de las permitidas para consignar el voto". ¿Qué sucede con estas papeletas protestadas? La respuesta la brinda el Art. 6.004 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3264, que sólo ordena que estos votos no se cuenten durante el escrutinio *original* llevado a cabo en los colegios de votación. Preceptúa que tales papeletas sean remitidas a la Comisión Estatal de Elecciones para que ésta actúe sobre las mismas conforme el proceso establecido para el escrutinio general. A su vez, con relación al escrutinio general, la Comisión Estatal de Elecciones intervendrá "con las papeletas no adjudicadas y las protestadas *y contará o rechazará éstas*, según lo que a su juicio *se requiera por ley . . .*". (Énfasis suplido.) Art. 6.008 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3268.

Lo expuesto pone de manifiesto que es correcta la afirmación del Presidente de la Comisión Estatal de Elecciones de que la actual ley electoral *no dispone, específicamente, la nulidad de un voto por razón de contener iniciales.*

No obstante, defiende a ultranza ese resultado en virtud de una alegada reglamentación adoptada según el Art. 5.028 de la Ley Electoral de Puerto Rico, dispositivo de que la "Comisión Estatal de Elecciones dispondrá, mediante reglamento, la forma en que los electores marcarán sus papeletas a propósito de consignar en ellas su voto. El método para marcar la papeleta será el más sencillo posible que se ajuste al diseño de la papeleta, y permitirá que se pueda emitir el voto por una candidatura íntegra o por una candidatura mixta". 16 L.P.R.A. sec. 3231.

Expone que, a su amparo, la Comisión Estatal de Elecciones promulgó el 23 de mayo de 1988, por unanimidad, el Reglamento de Elecciones de 1988. El mismo rigió la mecánica de votación para estas recientes elecciones y las reglas a seguirse durante el escrutinio. A tal efecto, nos remite a la Regla 78 de dicho reglamento, pág. 89, definitoria así de un concepto —más detallado— de *papeleta protestada*:

*R. 78— Será protestada Toda Papeleta:*
 a) votada bajo dos (2) o más partidos políticos,
 b) que tenga arrancada la insignia de algún partido,
 c) *que tenga escrito* nombres o *iniciales* fuera de la columna de Nominación Directa, sean éstas al frente *o al dorso* de la papeleta, a excepción de lo que se expresa en la Regla Núm. 79 que sigue, o que sean las iniciales requeridas al dorso de las papeletas a los inspectores del colegio. (Énfasis suplido.)

Notamos, pues, que esta Regla 78, *supra*, si bien caracterizó como "protestable" toda papeleta con iniciales, *no dispuso nada en torno a su nulidad.* Aun así, el Presidente de la Comisión Estatal de Elecciones insiste en que la reglamentación lo vislumbró. Para ello invoca la Regla 78 del Reglamento Oficial de las Elecciones Generales de 1984 (Reglamento de Elecciones de 1984), pág. 87 —aprobado el 8 de junio para las elecciones de ese año— que expresamente preceptuaba:

*R. 78 SERA NULA TODA PAPELETA:*
 a) votada bajo dos (2) o más partidos políticos,
 b) que tenga arrancada la insignia de algún partido,
 c) *que tenga escrito* nombres o *iniciales* fuera de la columna de Nominación Directa, sean éstas al frente *o al dorso de la papeleta*, a excepción de lo que se expresa en las Reglas #79 y 80 que siguen, o que sean las iniciales requeridas en este Reglamento a los inspectores del colegio. (Énfasis suplido.)

Con vista a esa regla, el Presidente de la Comisión Estatal de Elecciones argumenta:

Como consecuencia de dicha determinación reglamentaria, la Honorable Comisión adoptó los mismos criterios utilizados en años anteriores, a los efectos de decretar la nulidad de papeletas inicialadas al frente o al dorso de las mismas. Para las elecciones de 1984, se adoptó el procedimiento a utilizarse por la Honorable Comisión con relación al tratamiento que se debía aplicarse [sic] a las papeletas así inicialadas. Se acompaña con la presente el procedimiento adoptado por ella, según lo

revela el documento titulado: "Procedimiento para papeletas con iniciales de electores al Dorso", debidamente certificado por el Secretario de la Comisión en dicho año, el Sr. Ramón Bauzá Escobales, el cual se marca como *Anejo C. En vista de que no se adujeron razones legítimas para revocar ese acuerdo o procedimiento establecido en el año 1984, la Comisión optó por dejar vigente el citado criterio.*

El mencionado acuerdo determina que las papeletas con iniciales al *dorso* de la misma —que no sean las de los funcionarios del colegio— serán anuladas en el escrutinio general. Le señalamos a este Honorable Tribunal, que no es correcto, por lo tanto, el criterio legal de los Recurrentes, a los efectos de que solamente serían nulas las papeletas cuando las iniciales del votante apareciesen al frente de éstas, en consideración a que la Regla adoptada incluye ambas posibilidades. (Énfasis suplido.) Alegato del correcurrido, págs. 6–7.

No tiene razón. El reglamento aludido, adoptado el 23 de mayo de 1988, sin reservas *sustituyó totalmente* al reglamento de 1984. Por ende, *eliminó de plano, de jure,* el concepto equivalente de papeleta protestada como *nula.* Ciertamente, la definición de *papeleta protestada* vigente en que se apoya la determinación de la Comisión Estatal de Elecciones para anular las papeletas no puede corresponder a la definición de *papeleta nula* del reglamento aprobado en 1984. En el reglamento aprobado para las elecciones de 1988, *el tratamiento de nulidad por razón de iniciales no fue incorporado.* Es imposible, jurídica y judicialmente, llegar a otra conclusión.

Por si hubiera alguna duda, es importante destacar que, específicamente, la Regla 93 del Reglamento de Elecciones de 1988 *derogó todas las disposiciones* del Reglamento de Elecciones de 1984. *¿Cómo puede sostenerse la vigencia de una norma en una regla derogada?* Si no la hay, y la Ley Electoral de Puerto Rico no lo ordena, *¿cómo justificarse entonces una declaración de nulidad en las papeletas protestadas, de su faz, por solamente contener iniciales?* ¿Cómo puede la opinión mayoritaria rubricar esa nulidad y,

simultáneamente, concluir que aquí la Comisión Estatal de Elecciones "no anuló las papeletas bajo el fundamento de fraude"? Opinión mayoritaria, pág. 29.

## IV

No obstante lo expuesto, la mayoría del Tribunal, usando la magia de Macondo, concluye que *papeleta protestada* es sinónimo de *papeleta nula.* Aun cuando hemos visto que se derogó la equivalencia conceptual de *papeleta protestada-nula* contenida en la Regla 78 del Reglamento de Elecciones de *1984,* por *inferencia* se llega a esa nulidad a base de que la actual Regla 71 del Reglamento de Elecciones de 1988, págs. 82–83, señala, como guía, que en "el escrutinio general o recuento se actuará con relación a las papeletas no adjudicadas y las protestadas para determinar *la validez o nulidad de éstas".* (Énfasis suplido.)

La endeblez de esa determinación es patente. Es dudoso que con una simple referencia reglamentaria pueda justificarse su existencia y, así, perpetuar la confiscación de uno de los más sagrados derechos: el voto. Se aduce que la "variante en el reglamento actual, que sustituyó la palabra 'nula' por 'protestada', tiene el propósito de flexibilizar lo relativo a la anulación de esas papeletas, de suerte que en lugar de decretarse inflexible y absolutamente su nulidad en el escrutinio original, a ese nivel únicamente se protesten y se remitan dichas papeletas a la comisión en pleno para que sea ésta quien dilucide su adjudicación o rechazo. Así, se le ofrece la oportunidad a quien reclame su adjudicación a presentar prueba en favor de su reclamo". Opinión mayoritaria, pág. 25. Inquirimos, ¿a qué elector se le ofreció esa oportunidad ante la Comisión Estatal de Elecciones? ¿Cómo compaginar ese enfoque con el trasfondo de nulidad *radical* adoptado por la Comisión Estatal de Elecciones? *No negamos la posibilidad de que la adjudicación de una papeleta oportunamente conlleve su nulidad. Lo que sí objetamos es la de-*

*terminación arbitraria, a priori, sin fundamento estatuta-*
*rio o reglamentación que ha refrendado este Tribunal.*

La opinión mayoritaria del Tribunal sostiene, además,
que es

> . . . improcedente colocar sobre la comisión el peso de la
> prueba en los casos en que se invaliden o se anulen papeletas
> por el fundamento en cuestión, puesto que ello podría requerir
> de la C.E.E. tener que descorrer el velo de secretividad que
> cubre el ejercicio del voto de aquellos electores cuyas iniciales
> puedan ser compatibles con las que aparezcan en las pape-
> letas. ¿Cómo saber si las iniciales J.P.R. estampadas en una
> papeleta corresponden a Juan Pérez Rodríguez o a José Pa-
> gán Rivera, o a cualquier otra persona con tales iniciales? Eso
> sólo lo conoce la persona que estampó las iniciales y aquella a
> quien podría ir dirigido el mensaje. De manera que, si se in-
> terpretara que el modo legal y constitucional de anular un
> voto *por este fundamento* es mediante la concesión de unas
> garantías procesales previas al elector cuyo voto fuera a anu-
> larse, tales como citación, oportunidad de ser oído, pruebas
> caligráficas, etc., tendrían que ser citados e interrogados
> todos los electores de ese colegio; no sólo aquellos cuyos nom-
> bres puedan responder a las iniciales contenidas en la pape-
> leta. Considérese que cualquier persona en el colegio pudo ha-
> ber hecho marcas o iniciales en su papeleta aun cuando su
> nombre no concuerde con las mismas. Ello acarrearía, obvia-
> mente, el peligro de la pérdida de la secretividad del voto de
> esos electores. Por lo complicado y prolongado de la pesquisa
> podría hacerse inoperante la protección a la secretividad que
> garantiza la ley. Opinión mayoritaria, págs. 28–29.

El razonamiento merece cierta reflexión. *Primero*, pre-
sumiendo que ello implicara descorrer el velo de secretividad
de aquellos electores —cuyas iniciales en la papeleta son
compatibles a otras iniciales— ¿no sería igual en un procedi-
miento judicial? *Segundo*, ¿puede seriamente —en términos
de probabilidades matemáticas— concederse solidez a un ar-
gumento fundado en la *coincidencia* de iguales iniciales?
*Tercero*, ¿qué es más importante, el derecho al voto o que por

razones de peso y necesidad —al igual que con las recusaciones— se levante el manto de la secretividad? Y, *cuarto,* ¿por qué sería necesario citar y contrainterrogar a todos los electores? Para contestar estas interrogantes, el retruécano no es permisible.

*El esquema jurídico procedente —compatible con el debido proceso de ley— es sencillo, económico y administrativamente viable. A su amparo, la función de la Comisión Estatal de Elecciones sería: primero, constatar si cabe la posibilidad de que determinadas iniciales en una papeleta correspondan al nombre de algún elector que, según las listas oficiales o aquellas confeccionadas en los colegios a tenor con nuestro mandato en P.N.P. y P.I.P. v. Rodríguez Estrada, supra, haya votado en el colegio. De resultar en la negativa, ausentes otras razones, el voto sería anulado. De ser en la afirmativa, al elector a quien pudiera corresponder esas iniciales se le daría la oportunidad de explicar si él las insertó y por qué. De surgir que no las puso, la Comisión Estatal de Elecciones anularía la papeleta por entonces haberse también demostrado la intención de algún otro elector de identificarse ilegalmente. Nótese que, ante las situaciones expuestas, sí cabe concluir que las iniciales no fueron hechas inadvertidamente, por confusión o error producto de la ignorancia o de una instrucción errónea. De haber más de un elector con las mismas iniciales, se les citaría y dirimiría la cuestión.*

*Bajo este procedimiento no sería necesario citar y contrainterrogar a todos los electores de un colegio. Tampoco levantar el manto de secretividad o señalarlos públicamente de manera específica. Únicamente a aquellos cuyas iniciales pudiesen corresponder con las de sus nombres. El método de citación podría ser una convocatoria general a publicarse en los periódicos del país que expusiera —con referencia al precinto, unidad y colegio electoral— las iniciales involucradas y citara a comparecer a aquellos elec-*

*tores interesados en defender su voto. Este método, o uno análogo, cumpliría en esencia con el debido proceso de ley.*

La parte I de la opinión mayoritaria refleja lo *arbitrario* de la determinación mecanicista de la Comisión Estatal de Elecciones. Por un lado, se anulan radicalmente las papeletas con iniciales del elector para lograr la secretividad del voto, pero curiosamente se aceptan como marcas válidas "las siglas de los partidos: P[.]P[.]D[.], P[.]N[.]P[.] y P[.]I[.]P[.]; las iniciales y los nombres de los candidatos a Gobernador, tales como: R[.]H[.]C[.], B[.]C[.]R[.], R[.]B[.]M[.], Rafael, Baltasar y Rubén . . .". Manual, pág. 8. Nos preguntamos: si el propósito es "prevenir el que se utilicen marcas o *iniciales* que puedan servir para identificar el voto de algún elector" —(énfasis en el original) opinión mayoritaria, pág. 24.— ¿no son las anteriores marcas —caracterizadas como válidas por la Comisión Estatal de Elecciones— instrumentos suficientes para también, solapadamente, comunicar un mensaje preacordado?; ¿no conllevan esas marcas diferentes el efecto subrepticio de identificar o de distinguir esas papeletas de las otras? La *distinción es más aparente que real.*

## V

El acuerdo o resolución de la Comisión Estatal de Elecciones de 17 de noviembre de 1988 quizo revivir el concepto de nulidad radical de una papeleta iniciada. Estamos, pues, realmente ante una *enmienda* al reglamento en lo concerniente al escrutinio general. La misma es *ultra vires.* Contraviene el mandato estatutario del Art. 1.005(*l*) de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3013(*l*), preceptivo de que "cualquier enmienda durante el último mes antes de las elecciones o durante el día de las elecciones, y hasta que finalice el escrutinio, se hará por *unanimidad de votos en la Comisión*". (Énfasis suplido.)

Aclarada la verdadera naturaleza de la resolución y determinación de la Comisión Estatal de Elecciones —en-

mienda al reglamento adoptada durante el proceso de escrutinio— es ineludible concluir que no es válida por incumplir el requisito de *unanimidad* de votos establecido en el Art. 1.005(*l*) de la Ley Electoral de Puerto Rico, *supra*. La oposición del Comisionado Electoral del P.N.P., señor González, Jr., a la enmienda y determinación *impedía su adopción.*

Como dijimos en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra, págs. 513–515:

> Es evidente que el legislador meticulosamente quiso reservar esta facultad al criterio compartido —*pero exclusivo*— de los partidos políticos y sus comisionados. . . . A ellos remitió esa prerrogativa, en consonancia con sus inquietudes de que la "aprobación de reglas *sin consenso entre los partidos* y aquellos que representan cambios sustanciales en la preparación y organización del proceso constituyen peligros *muy serios*". (Énfasis suplido.)

> Esa preocupación, la *premisa de consenso partidista* y el evitar un desequilibrio en el balance partidista nos dan la clave para comprender la variante adicional en cuanto al método de votación de una enmienda reglamentaria durante el último mes que precede a una elección *y hasta que finalice el escrutinio*: "se hará por *unanimidad de votos en la Comisión*". *Otra vez se excluye al Presidente de la C.E.E. de intervenir en tal decisión.* En cualesquiera de los supuestos temporales, la norma opera contra una regla *absoluta* y no relativa, a distinción de la visualizada en el método de votación general en que el Presidente de la C.E.E. interviene según el Art. 1.006(e) de la Ley Electoral de Puerto Rico, [16 L.P.R.A. sec. 3014(e)]. *De prevalecer la contención del Presidente de la C.E.E.* [,] *estaríamos concediendo al partido de la mayoría, P.P.D., el derecho potencial de ejercer dos (2) votos: uno de su Comisionado Electoral y otro a través de la persona de aquél, miembro afiliado a dicho partido por imperativo de la ley.* Ello sería irreconciliable con la premisa cardinal de *consenso partidista* en esta área particularmente sensible según la intención del legislador.

> En resumen, cuando se trata de enmiendas reglamentarias para las elecciones y escrutinio en los últimos cuatro (4) meses

antes de las elecciones, la mecánica decisoria de la comisión sufre dos (2) alteraciones fundamentales: *primero, se remite al consenso mayoritario o unánime* absoluto *de los comisionados y, segundo, se prescinde del Presidente de la C.E.E. en esa etapa o en la posterior.* Huelga señalar que la *sabiduría* de este trámite no es materia de nuestra incumbencia. La misión judicial de este Foro no es juzgar su acierto, sino examinar si el medio elegido es compatible con nuestra Constitución y con la Ley Electoral de Puerto Rico. *McCormick v. Marrero, Juez,* 64 D.P.R. 260, 267 (1944). (Énfasis suplido y en el original.)

## VI

Una vez establecido que no existe ninguna disposición estatutaria o reglamentaria que tache una *papeleta protestada* como *radicalmente* nula, esto es "ab initio", ¿qué efectos jurídicos tiene esa laguna en el caso de autos? Ciertamente, no existe fundamento legal en qué apoyar la tesis de la Comisión Estatal de Elecciones —que refrenda la mayoría de este Foro— de que estas papeletas fueron correctamente anuladas. El esquema vislumbrado por la Asamblea Legislativa simplemente fue que, una vez protestadas las papeletas, no se contaran durante el escrutinio original y se remitieran a la Comisión Estatal de Elecciones.[4] Este organismo las contaría o rechazaría según la ley. *Ausente un imperativo legal de nulidad,* la gestión ulterior de la Comisión Estatal de Elecciones estaba sujeta forzosamente al ejercicio de su discreción, que no es —ni puede ser— absoluta o arbitraria, y al debido proceso de ley. Según apuntalado, *ello reclamaba un minucioso examen visual de cada papeleta, explorar las circunstancias que prevalecieron al momento de la votación*

---

[4] Hace ocho (8) años, en *P.P.D. v. Admor. Gen. de Elecciones* (O–81–27) —en su solicitud de revisión, pág. 22— el P.P.D. argumentaba que "[u]na papeleta protestada *no es una papeleta nula*. . . . La única consecuencia de que una papeleta sea clasificada como protestada es que no se contará en el colegio de votación".

*y detectar la intención del elector a la luz de lo resuelto por este Tribunal en casos anteriores. P.S.P. v. Com. Estatal de Elecciones*, supra.

El tribunal de instancia entendió "que dichas disposiciones estatutarias y reglamentarias son en principio válidas, como un mecanismo legítimo para garantizar la libertad del voto de cada elector individual. Si no se estableciera una regla prohibiendo que aun el propio elector ponga marcas en su papeleta que permitan identificar la persona que emitió el voto, sería demasiado fácil para personas inescrupulosas el presionar indebidamente a votantes particulares para que identifiquen su papeleta y luego voten a favor de un candidato o partido en particular, bajo la amenaza de que una vez se abran las urnas y se haga el escrutinio de los votos se podrá verificar si aparece en la urna la papeleta así identificada por el elector, con el voto emitido conforme la presión que fue ejercida. No tenemos razón alguna para cuestionar el juicio legislativo de que para evitar que esto ocurra se debe establecer de antemano un mecanismo que remueva por completo el incentivo para dicho comportamiento, asegurándole al que así actúa que su estratagema fracasará pues cualquier voto así identificado será anulado y no le servirá de nada al que ejerció dicha presión". Sentencia, pág. 7.

Estos pronunciamientos son correctos. Nos adherimos a nuestras expresiones en *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 297–298 (1980), opinión concurrente y disidente del Juez Asociado Señor Negrón García, y en *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741, 755 (1976), en cuanto a la importancia de la secretividad del voto para garantizar la independencia de juicio del elector.

Aun así, notamos que una regla o norma que sin un mínimo procesal propugne la nulidad radical de una papeleta —por sólo contener unas iniciales— conllevaría una inadmisible presunción de fraude electoral que se proyecta, simul-

táneamente, sobre todos esos electores y los funcionarios de sus colegios. Aparece así la grotesca sombra del contubernio fraudulento —elector-funcionario y compraventa de votos— sin que se demuestre a primera vista una intención indubitada de macular el proceso electoral con prácticas reprobables. Después de todo, sólo los funcionarios electorales —en ocasión de clasificar y escrutar inicialmente los votos en los colegios— son los únicos autorizados a examinar las papeletas y constatar la existencia de una marca o inicial figurada de antemano.

En estas circunstancias, el enfoque que la Comisión Estatal de Elecciones debió seguir era investigar si las iniciales o marcas reflejaban claramente la intención del elector de identificarse y de revelar su preferencia electoral, o si por el contrario fueron el producto de eventos fortuitos como instrucciones erróneas, mal interpretadas o confusas. ¿Cómo, si a solicitud del P.P.D. el Presidente de la Comisión Estatal de Elecciones diligentemente ordenó investigar —mediante peritos en caligrafía— la procedencia y legitimidad de unas marcas en otras papeletas, no pudo hacerlo con las de autos? De esta realidad tomamos conocimiento judicial. ¿Por qué la diferencia en el trato? Únicamente brindando el mismo tratamiento se supera cualquier reparo constitucional fundado en la aplicabilidad de una regla arbitraria e inflexible, y un trato desigual. ¿A qué oportunidad se refiere la opinión mayoritaria? Adviértase que esa simple investigación con los inspectores de colegio concernidos de ninguna manera descorría el velo de secretividad de todos los electores. Tampoco proveyó un trámite como el propuesto previamente, brindando así al elector la oportunidad de acudir a la Comisión Estatal de Elecciones a defender su voto. Por último, ¿cómo puede la opinión mayoritaria negar que la Comisión Estatal de Elecciones "no anuló las papeletas bajo el fundamento de

fraude"? Opinión mayoritaria, pág. 29. Si ello es así, ¿no estamos realmente ante una norma automática y absoluta?

Nos intriga cómo la opinión mayoritaria impone a los electores el peso de la prueba ante los tribunales en un trámite de *juicio de novo*. Este concepto, según estatuido en el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, implica que con anterioridad a acudirse en revisión al Tribunal Superior haya habido una vista administrativa previa. En el caso de autos, ¿cuándo se le dio esa oportunidad a los electores?

Si el propósito que anima la opinión mayoritaria es proteger al elector, ¿por qué la Comisión Estatal de Elecciones se negó a oírlos? Ese es requisito elemental del debido proceso de ley. No nos explicamos cómo puede prescindirse del mismo ante una regla de nulidad radical.

Es inquietante cómo la opinión mayoritaria llega a sugerir que los electores deben tener el conocimiento de las consecuencias de nulidad de poner sus iniciales. Se concluye que "el derecho al voto, no empece su gran preeminencia, no tiene credenciales de inimpugnabilidad". Opinión mayoritaria, pág. 29. En apoyo se invoca el principio de que la "'ignorancia de las leyes no excusa de su cumplimiento'". Íd., pág. 30. La dificultad de este argumento es que, según hemos visto, en ningún momento la Comisión Estatal de Elecciones estableció claramente en su reglamento la sanción de nulidad radical. Le ha tomado varias páginas al Tribunal intentar sostenerlo con una inferencia *indirecta* en la Regla 71 del Reglamento de Elecciones de 1988. Al hacerlo, se ha ignorado que la Comisión Estatal de Elecciones no realizó al respecto campaña pública alguna de orientación. Tampoco que advirtió de ello al elector en el impreso de la papeleta. Menos, que sus inspectores de colegio no adoptaron medidas —pudiendo hacerlo— para evitar que una papeleta teñida ab initio de nulidad fuera depositada en las urnas.

Causa mayor consternación los postulados en que se fundamenta la mayoría del Tribunal para imputarle ese conocimiento. ¿Desde cuándo el derecho constitucional a ejercer el voto es renunciable por "ignorancia"? Insistimos en que ese tipo de análisis restrictivo atenta contra el espíritu del Art. VI, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 367, preceptivo de que "[n]adie será privado del derecho al voto por no saber leer o escribir . . .". Después de todo, las "renuncias a los derechos fundamentales no se presumen. *F.S.E.* v. *Comisión Industrial*, 105 D.P.R. 261 (1976). Estas deben ser 'expresas y no presuntas, así como voluntarias y efectuadas con pleno conocimiento de causa'". *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720, 738 (1978). No podemos olvidar que "la renuncia de derechos en general no se presume y es de estricta interpretación. *No es lícito deducirla de expresiones de dudosa significación.*" (Énfasis suplido y escolio omitido.) *Quiñones Quiñones v. Quiñones Irizarry*, 91 D.P.R. 225, 266 (1964).

En resumen, el Tribunal se aparta del precedente y técnica adjudicativa establecida en *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 429 ("pavazos"), en que resolvimos:

Ciertamente la facultad constitucional que hemos reconocido en el pasado a la Asamblea Legislativa para regular y ordenar el procedimiento electoral dentro de los parámetros fijados en nuestra Ley Fundamental, comprende la forma, manera y mecánica de cómo se deben dejar constancia, plasmar y señalar la intención y voluntad del elector. Ahora bien, nuestra misión en casos de esta naturaleza es cumplir con el mandato de ley, pero reconociendo que el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humanas se desenvuelven. *En esas instancias, nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional. Así, cuando el texto legal habla y se configura*

*en términos absolutos, requiere que hagamos un esfuerzo por evitar el choque constitucional, si bien validándolo, pero atemperándolo si posible, y se logra satisfactoriamente la armonía entre el interés gubernamental envuelto y el valor primario del sufragio.* (Énfasis suplido y en el original.)

Por estas razones rechazamos la tesis de la opinión mayoritaria de que "[a]cceder a planteamientos de derecho a la renuncia de dicha prerrogativa por el elector o a argumentos que propugnan la impotencia de la comisión para anular papeletas marcadas o iniciadas, *significaría abrir la puerta a una época de oscurantismo electoral que debe quedar confinada en el pasado, aunque recordada por los libros de historia para que jamás se repita*". (Énfasis suplido.) Opinión mayoritaria, págs. 21–22.

## VII

Un "tribunal puede tomar conocimiento judicial de hechos para suplementar las alegaciones siempre que sea propio dicho conocimiento según la Ley de Evidencia". Véanse: J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña, Procedimiento Civil*, San Juan, Pubs. J.T.S., 1985, Vol. II; *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 423. No podríamos concebir mejor manera de revivir el oscurantismo electoral que la imitación del mundo de enclaustramiento de una abadía medieval. Así, como los monjes que recrea Umberto Eco en su magnífica novela *El Nombre de la Rosa*, nos contentaríamos con seguir obedientemente el dirigismo impuesto por el supremo abad y dedicaríamos largas y monótonas horas a los ritos improductivos de la "santa empresa". Mientras tanto, fuera de los muros sombríos, el mundo se derrumba y mucha gente impacientemente clama por JUSTICIA. Ante ese reclamo, aceptamos gustosamente el papel de inquisidor, entendido en su moderna acepción, a saber, "[e]l que hace indagación de algo para comprobar su realidad

y sus circunstancias".(5) Y, como Guillermo de Baskerville, sin necesidad de utilizar instrumentos de tortura, ponemos al descubierto las herejías electorales. Al cabo de más de dos (2) décadas de servicios ininterrumpidos en la Judicatura, es imposible someternos al rigor disciplinario de los monjes cartujos.

Contrario al prisma mayoritario, es materia susceptible de conocimiento judicial que en estas elecciones —en un número no determinado de colegios de votación— los funcionarios instruyeron a los electores sobre la forma de doblar las papeletas antes de depositarlas en las urnas. Básicamente, las referidas instrucciones fueron a los efectos de que los votantes, al doblar las papeletas, se aseguraran de que las iniciales quedaran en la parte exterior de las mismas. Ello se debió a que ni en el reglamento, como tampoco en el Manual, se incluyó una *instrucción* específica sobre este particular. Tampoco se consignaron en las papeletas de votación tales instrucciones. *Menos, se hicieron advertencias a los electores de que no escribieran nombres o iniciales en las papeletas bajo pena de nulidad.*

Obviamente, la instrucción no fue uniforme. Al brindarse un lenguaje distinto correspondiente a cientos de inspectores de colegios, ad hoc, el potencial de desinformación y confusión se incrementó. Es razonable concluir que en un universo tan amplio de electores —de diversa extracción social y cultural, en ciertos casos con limitaciones físicas y mentales, y algunos nerviosos— un número indeterminado las interpretara mal y creyera que debía iniciar las papeletas antes de depositarlas en las urnas. "[H]emos de recordar la admonición constitucional de que '[n]adie será privado del derecho al voto por no saber leer o escribir . . . .', Art. VI, Sec. 4. En su correcta dimensión este postulado puede con-

---

(5) *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 776.

llevar, en sus variadas manifestaciones, una prohibición a que se anule el voto porque el elector *no siga instrucciones que sólo afectan de manera mínima el interés legislativo que persigue reconocer la verdadera voluntad del elector.*" (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones,* supra, pág. 433.

Es necesario resaltar que la Regla 36(a) del Reglamento de Elecciones de 1988 contiene las *únicas instrucciones que debían* ofrecer los inspectores de colegio. Así lo admite en su comparecencia el Presidente de la Comisión Estatal de Elecciones. En lo pertinente, dispone que:

a) Los Inspectores Propietarios del Partido Popular Democrático y del Partido Nuevo Progresista harán entrega de las dos papeletas de votación. El primero entregará la papeleta estatal y el segundo la municipal y le leerán las siguientes instrucciones:

"Le estamos entregando dos (2) papeletas. En la papeleta blanca aparecen los candidatos a los cargos de Gobernador, Comisionado Residente y Legisladores. En la papeleta amarilla aparecen los candidatos a Alcalde y Asambleíst[a] Municipal."

La lectura de estas instrucciones serán alternadas entre estos dos (2) funcionarios.

Además, se cerciorarán que los electores depositen sus papeletas en la urna correspondiente. Regla 36(a) del Reglamento de Elecciones de 1988, pág. 33.

Sin embargo, por su parte, la Regla 41B(6) del mismo reglamento, pág. 41, dispone que:

Una vez haya votado, pero antes de salir de la caseta de votación, *el elector doblará las papeletas electorales con varios dobleces* de manera que ninguna parte del frente de ellas quede expuesta a la vista, *asegurándose que las iniciales de los inspectores del colegio al dorso de éstas queden visibles.* Inmediatamente después de terminar con esta operación, saldrá de la caseta y en *presencia de los inspectores del colegio procederá a mostrar las iniciales al dorso de las papeletas* y depositará la papeleta estatal y la municipal en las urnas debidamente identificadas a estos fines. (Énfasis suplido.)

Como puede apreciarse del texto, la regla antes citada contiene afirmativamente una directriz *específica* para los electores referente al momento, sitio y forma de doblar la papeleta. Sin embargo, aun cuando no fue concebida como *instrucción*, nos resulta difícil —por no decir incomprensible— entender la posición del Presidente de la Comisión Estatal de Elecciones cuando nos dice que es "inmaterial el hecho de la forma en que se doble la papeleta para depositarla en la urna". Alegato del correcurrido, pág. 12. ¿En qué quedamos? ¿No imponía la Regla 41B(6) del Reglamento de Elecciones de 1988 una mecánica específica con miras a exponer y dejar visibles las iniciales de los inspectores del colegio?

Hemos visto que, inexplicablemente, el reglamento no proveyó disposición o instrucción alguna para que este mensaje fuera trasmitido verbalmente por los funcionarios de colegio. *Sin embargo, lógicamente alguien tenía que brindarla.* "Es elemental el axioma de que la ley no puede exigir cosas inútiles ni absurdas." *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 444. No cabe afirmar que los miles de electores que acudieron a votar conocían ese detalle reglamentario. Por ello, repetimos, muchos funcionarios electorales, *sua sponte*, optaron por instruirlos al respecto, en particular aquellos que ejercían su derecho por primera vez o inquirieron. La omisión de una instrucción en las papeletas, la ausencia de una campaña educativa y orientadora sobre este particular y una instrucción *general* en los colegios robustece la razonabilidad de la conclusión de que muchos electores desconocían la manera apropiada de doblar la papeleta.

No podemos, pues, convenir con la premisa del Presidente de la Comisión Estatal de Elecciones de "asumir . . . que los funcionarios cumplieron cabalmente con su obligación legal y reglamentaria, *y que no se dieron instrucciones adicionales ni distintas a las requeridas sobre dicho tema por el citado Reglamento*". Alegato del correcurrido,

pág. 12. ¿Cómo sostener que no se brindaron tales instrucciones y, simultáneamente, lograr que los electores, *dentro de las casetas*, doblaran las papeletas con varios dobleces "asegurándose que las iniciales de los inspectores de colegio al dorso de éstas qued[aran] visibles"?

Lo razonable es todo lo contrario. "'Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.'" *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, 'nuestro papel, aunque limitado, no se desarrolla en un *vacío*. Cuando los hechos son suficientemente *abrumadores*, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en desconocer metódicamente *lo que todo el mundo sabe*'. (Énfasis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507–508 (1943)." *Noriega v. Gobernador*, 122 D.P.R. 650, 696 (1988), opinión de conformidad del Juez Asociado Señor Negrón García.

A su vez, la obligación del elector de *"mostrar las iniciales al dorso de las papeletas"* —(énfasis suplido) Regla 41B(6) del Reglamento de Elecciones de 1988, pág. 41— *a los inspectores del colegio* necesariamente imponía a éstos el *deber recíproco* de evitar que las papeletas que contenían otras iniciales —potencialmente protestables— fueran así depositadas en las urnas. *Ese era el momento para llamar la atención al elector de las consecuencias de tales iniciales.* Cabe señalar que la ley y el reglamento visualizan que los inspectores de colegio supervisen y velen por que los procedimientos se conduzcan apropiadamente. Regla 36(a) del Reglamento de Elecciones de 1988. Además, se prevee la posibilidad de que un elector dañe, "por accidente o equivocación", cualesquiera de las papeletas y se le reconoce el derecho entonces a sustituirla. Art. 5.029 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3232. La ausencia de advertencia escrita, unida a la omisión de los funcionarios electorales,

descartan toda posibilidad de —a priori o a posteriori— imponerle a los electores una presunción de fraude y la penalidad de nulidad radical del voto. Al decir de la opinión mayoritaria, "[n]o se puede presumir lo que la simple vista niega". Opinión mayoritaria, pág. 28. "Corresponde a los organismos del Estado hacer lo más viable posible el ejercicio del sufragio, fundamento esencial de la democracia, y no puede ni debe éste rehuir esa responsabilidad mediante el traslado de parte de la misma al elector." *P.N.P. y P.I.P. v. Rodríguez Estrada,* supra, pág. 504.

No puede desligarse la Comisión Estatal de Elecciones —como pretende su Presidente— de los "errores que hubiesen podido cometer" los inspectores de colegios al brindar las instrucciones. Menos, de las consecuencias de permitir, a ciencia y paciencia, que se depositaran en las urnas papeletas que visiblemente contenían iniciales adicionales. En *P.P.D. v. Admor. Gen. de Elecciones,* supra, pág. 240 esc. 31, desaprobamos semejante *contención* al declarar terminantemente que "recae sobre la Comisión la ineludible obligación de suplirles el material de trabajo, *brindarles orientación,* facilitarles manuales de instrucción *y mantener una estrecha supervisión del trabajo que realizan.* En fin, que en lugar de que la Comisión opere bajo la teoría de 'manos afueras', *debe ejercer un grado sumo de atención hacia la participación que la ley le tiene reservada a dichos funcionarios y absorber con mayor desvelo la responsabilidad que sus actos no fraudulentos ni delictivos acarrean".* (Énfasis suplido.)

## VIII

De los documentos unidos a los autos originales del ilustrado foro de instancia, sin esfuerzo, podemos arribar a nuestras propias determinaciones. *P.P.D. v. Admor. Gen. de Elecciones,* supra. Nos referimos a las papeletas incorporadas allí por el P.N.P. a su recurso, a saber, los Apéndices

1–10. La legitimidad de estas papeletas no fueron impugnadas por los opositores y forman parte de las alegaciones y autos originales. Un cuidadoso estudio de las mismas refleja que: (1) salvo una, *todas* las iniciales están al *dorso* de las papeletas de forma tal que, razonablemente, al doblarse, las iniciales quedan visibles; (2) en cuatro (4) de las papeletas (Apéndices 1, 2, 5 y 7), las iniciales están en la parte superior, en la esquina de la papeleta, *junto* a las iniciales de los funcionarios del colegio; (3) en los Apéndices 4 y 6 las iniciales están también en las esquinas, pero en la parte inferior de las papeletas, y (4) cinco (5) de las papeletas (Apéndices 2, 4, 5, 6 y 7) corresponden a una *misma unidad electoral.*

Con vista a ese examen visual, y al trámite pautado en la Regla 41B(6) del Reglamento de Elecciones de 1988, se imponen varias observaciones. *Primero*, por estar visibles las iniciales puestas por el elector, es inevitable concluir que — excepto una— *no medió intención alguna de ocultarlas a los inspectores de los colegios. Segundo*, de hecho, de haberse seguido el trámite dispuesto en la aludida Regla 41B(6) del Reglamento de Elecciones de 1988, pág. 41, estos electores las doblaron "asegurándose que las iniciales . . . qued[aran] visibles . . . [y] mostrar[an] las iniciales al dorso de las papeletas" a los inspectores del colegio. *Tercero*, de haber estado atentos los inspectores, debieron percatarse de esas iniciales adicionales y no permitir que dichas papeletas fueran así depositadas en las urnas. Y, más importante aún, excepto por estas iniciales (y la de la letra "K" al frente) *ninguna otra de las papeletas contiene marca u otro defecto al frente o al dorso que la anule.*

Repetimos, *una papeleta protestada no es sinónimo de una papeleta nula.* Aunque existe la posibilidad de que finalmente pueda declararse inválida, esa determinación está supeditada al examen, caso por caso, de la Comisión Estatal de Elecciones, con audiencia del elector, y únicamente al demostrarse una intención de fraude. Por ende, dicho organismo no

podía disponer de este asunto de la forma sumaria en que procedió. Repetimos, su facultad estaba condicionada a investigar qué ocurrió. Debió citar a los funcionarios de colegio correspondientes según lo dispone la Regla 83 del Reglamento de Elecciones de 1988,(6) y aclarar la situación antes de optar por implantar una regla automática y tan drástica como la anulación de los votos.

## IX

El mandato constitucional consagrado en el Art. II, Sec. 2 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, de garantizar el sufragio universal, igual, directo y la protección contra toda coacción en su ejercicio, conlleva para este Tribunal una "obligación [de] hacerlo observar y respetar. No se observaría ni respetaría si permitiésemos que el voto emitido pudiera ser anulado o que su valor pudiera ser mermado por cualquier ataque. La legalidad se presume; la desviación del cumplimiento de la ley tiene que ser probada. *Respecto al ejercicio del derecho al voto no podemos exigir menos. Goza de la presunción de legalidad y validez, y quien lo impugne tiene la carga de la prueba para destruir dicha presunción*". (Énfasis suplido.) *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 221.

Reconocemos que el Estado tiene un interés legítimo en la secretividad del voto cuyo objetivo principal es evitar el engaño y garantizar que la voluntad del pueblo se exprese libremente en las urnas, protegiendo así al elector de las coacciones y represalias que pondrían en peligro su integridad y la consiguiente sinceridad del sufragio. Sin embargo, por la naturaleza fundamental del derecho involucrado, no toda

---

(6) Dispone que:

"La Comisión se reserva el derecho de convocar los funcionarios electorales que crea necesarios para aclarar cualquier situación que estime menester." Regla 83 del Reglamento Oficial de las Elecciones Generales de 1988, pág. 91.

irregularidad en el proceso electoral puede dar lugar a la aplicación automática de una regla confiscatoria del voto. *P.P.D. v. Admor. Gen. de Elecciones*, supra, pág. 241.

Al interpretar nuestra ley electoral, hemos de balancear el interés de evitar el fraude sin macular innecesariamente el derecho al voto. Nuestra misión judicial es conceder el sufragio (*enfranchise*), no anularlo (*disenfranchise*). Bajo un *riguroso escrutinio judicial* no debemos invalidar un voto, a menos que esté claramente establecido que la persona no era elector capacitado o tuvo la intención de violentar la ley cometiendo fraude.[7]

A tono con esta visión, no procede anular *automáticamente* una papeleta protestada por sólo tener al dorso iniciales distintas a las de los funcionarios de colegio. Es menester demostrar que el elector hizo la marca intencionalmente y con el único propósito fraudulento de identificarse. Si las iniciales fueron puestas al dorso de la papeleta por motivo de una instrucción confusa o por error —y no con la intención dolosa de hacer su papeleta identificable— debe sostenerse la validez del voto y no su anulación.

La actuación de la Comisión Estatal de Elecciones de 17 de noviembre, que anula las papeletas donde aparecían al dorso iniciales distintas a las de los funcionarios de colegio, rebasó el propio texto de la ley y del reglamento. *Repetimos, no hay disposición alguna que exija esa interpretación mecánica.* La interpretación de nulidad radical es forzada, que ha tenido —al existir otras rutas decisorias menos costosas y traumáticas— el efecto impermisible de invalidar, injustificadamente, el ejercicio de la franquicia electoral. *P.P.D. v. Admor. Gen. de Elecciones*, supra.

---

[7] *In re Contest of 1979 General Election, Etc.*, 414 A.2d 310 (Pa. 1980); *In re Recount of Ballots Cast in General Election*, 325 A.2d 303 (Pa. 1974); *In re Luzerne County Return Board*, 290 A.2d 108 (Pa. 1972); *In re Primary Election of 1971*, 281 A.2d 642 (Pa. 1971).

La Comisión Estatal de Elecciones y este Tribunal Supremo han impuesto una regla confiscatoria del voto que parte de la premisa equivocada de que toda inicial al dorso de una papeleta —además de las de los funcionarios de colegio— fue escrita con intención de infringir la ley. No toma en consideración el hecho de que la inclusión de tales *iniciales al dorso de la papeleta* por algunos electores pudo muy bien deberse a una interpretación errónea de una instrucción confusa. De lo contrario, ¿cómo explicar que esas iniciales fueron puestas precisamente al lado de las correspondientes a los inspectores de colegio? ¿No es a esos inspectores a quienes el elector tenía que mostrarlas antes de depositar las papeletas en las urnas? La incógnita debe despejarse, primeramente, ante la propia Comisión Estatal de Elecciones y no ante los tribunales.

La decisión de la Comisión Estatal de Elecciones se aparta de la norma expuesta en *P.S.P. v. Com. Estatal de Elecciones*, supra. Allí nos pronunciamos contra la anulación de un voto porque un elector —por nerviosismo, confusión o limitada capacidad intelectual— *interprete mal una instrucción* y cometa un error "que sólo afect[a] de manera mínima el interés legislativo que persigue reconocer la verdadera voluntad del elector". Íd., pág. 433.

Igualmente reconocimos la supremacía de la clara intención del elector al marcar su papeleta de votación sobre cualquier interpretación *literalista* del estatuto que pudiera frustrar el valor de un voto emitido. También señalamos que "el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humanas se desenvuelven. En esas instancias, nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 429.

## X

Por último, tomamos también conocimiento judicial de que el pasado 7 de diciembre de 1988 la Comisión Estatal de Elecciones certificó oficialmente al Lcdo. Héctor Luis Acevedo, candidato del P.P.D., como Alcalde de San Juan. Prevaleció sobre su más cercano oponente, el Sr. José Granados Navedo (P.N.P.), por una mínima ventaja de veintinueve (29) votos.

Esa estrechez matemática le impedía a la Comisión Estatal de Elecciones despachar sumariamente los planteamientos del P.N.P.; menos, expedir apresuradamente una certificación. Esa certificación oficial excluyó los votos objeto del presente recurso. También una cantidad indeterminada de otros votos no adjudicados emitidos al amparo de nuestro mandato en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra. Esta última situación sirvió de fundamento a otros procedimientos en el tribunal de instancia.

Reconocemos parcialmente la razonabilidad del argumento del P.P.D., que acceder a la petición del P.N.P. equivaldría a obligar un nuevo recuento. Pero es menester señalar que sería uno *limitado*. Como remedio, no es la primera vez que este Tribunal lo ordena. Ya lo hicimos en *P.P.D. v. Barreto Pérez*, supra, pág. 385. *En toda elección, en particular una cerrada, es crucial que no quede duda de la legitimidad del vencedor. Aquí no se logra anulando votos.* Menos, con la interpretación avalada por la mayoría del Tribunal. "Lo vital es que triunfe el pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes". Íd., pág. 387.

Los tiempos han cambiado. La nueva realidad socio-política del país exige trámites más confiables y seguros. Reglas y procedimientos que antes no se cuestionaban son al presente motivo de serias controversias. El fenómeno puede ser

atribuido a que, en el pasado cercano, un solo partido dominaba la escena política del país. Hoy, por el contrario, las fluctuaciones en los cambios de mando, el surgimiento de partidos vigorosos y el fortalecimiento de otros —combinado con el creciente auge de la desafiliación y el voto independiente— han propiciado situaciones impredecibles e insospechadas. Actualmente, cada cláusula estatutaria, cada disposición reglamentaria, por insignificantes que parezcan, pueden convertirse en el agente decisivo de una contienda política. Nos preocupa la recurrencia de controversias electorales similares.

Independientemente del desenlace final, de seguro se impone en el mañana una amplia y efectiva campaña educativa —previa a los eventos comiciales— sobre todos estos extremos. El Estado debe minimizar el afloramiento de este tipo de debate judicial, a la par que garantizar a cada elector una mayor seguridad en el ejercicio de su derecho al voto.

Recapitulando, erró el tribunal de instancia. En el caso de autos sólo hacemos cumplida justicia al revocar a dicho foro y a la Comisión Estatal de Elecciones, y al ordenar a ésta —salvo determinación fundada en prueba demostrativa de fraude— que adjudique como válidas y cuente las papeletas que contienen iniciales al dorso. Obviamente, "[c]ualquier certificación de candidatos o procedimiento que se desvíe de lo allí ordenado[, en *P.N.P. y P.I.P. v. Rodríguez Estrada*, supra,] carecerá de toda eficacia y será nulo a todo efecto legal". *P.S.P. v. Com. Estatal de Elecciones*, supra, pág. 541.

Hoy el Tribunal ha adoptado una interpretación confiscatoria. La misma —favorable al P.P.D.— es contraria a toda la progenie de casos electorales del pasado, y más recientes, en abono del sufragio electoral. *Mundo Ríos v. Gobernador*, 121 D.P.R. 477 (1988); *Claudio v. Gobernador*, 121 D.P.R. 744 (1988); *Rivera v. Gobernador*, supra.

Injustamente se ha devaluado el valor del precedente judicial (*stare decisis*). Como dijimos en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 638–639 (1988), la "cuestión no tiene relevancia. Salvo uno, no queda ninguno de los miembros integrantes del Tribunal Supremo de aquella época. Sólo el valor intrínseco de los fundamentos de las ponencias mayoritarias, concurrentes y disidentes. La cuestión de precedente es, por lo tanto, inconsecuente. Lamentablemente nuestra prédica ha sido en el desierto. Con libertad para otro curso decisorio, la mayoría ha optado por sostener . . . un . . . enfoque . . . restrictivo e incompleto. Como camino decisorio intelectual, no logra superar el sentido de justicia ni da plena vigencia el *derecho vivo* apuntalado en un verdadero principio de igualdad política. *La verdad jurídica nunca puede atentar contra la verdad humana. Después de todo, la verdad es como el agua, o es pura o no lo es*". (Énfasis suplido y en el original.)

Es un eufemismo proclamar que la interpretación y decisión mayoritaria promueve el derecho al voto. Opinión mayoritaria, pág. 30. Se han anulado y confiscado votos sin brindarle a los electores un mínimo de debido proceso de ley. Ha prevalecido la forma sobre la sustancia; lo injusto sobre lo justo.

—O—

## RESOLUCIÓN

San Juan, Puerto Rico a 13 de enero de 1989.

En cuanto a la Moción Informativa, Aclaratoria y de Reconsideración Parcial, el Tribunal se da por enterado y provee no ha lugar a la reconsideración parcial.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto

disidente, al cual se une el Juez Asociado Señor Rebollo López. El Juez Asociado Señor Ortiz no intervino.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Voto disidente del Juez Asociado Señor Negrón García, al cual se une el Juez Asociado Señor Rebollo López.

Accederíamos al pedido de los abogados Miguel Pagán y Eliezer Aldarondo Ortiz, y por vía de reconsideración eliminaríamos los pronunciamientos vertidos en la opinión mayoritaria en torno a la conducta forense de ambos. *Limitaríamos los mismos a una amonestación.*

La opinión mayoritaria les critica por no haber acompañado al tribunal de instancia —ni a este Foro— copia de la Resolución de la Comisión Estatal de Elecciones o explicado su omisión (opinión mayoritaria, pág. 10 esc. 1). También se les repudia y censura que nos sometieran *directamente*, como prueba, unas papeletas y varias declaraciones juradas de electores que, alegadamente, iniciaron sus papeletas por una interpretación de unas instrucciones confusas de los inspectores de colegio. Además, se les cuestiona que originalmente sostuvieran que fundaban su caso en innumerables papeletas y testigos que luego no presentaron. En síntesis, la mayoría rechaza que en estas circunstancias el Partido Nuevo Progresista (P.N.P.) haya sometido el caso como una *cuestión de derecho.* Caracteriza ese proceder como un "cúmulo de anomalías" en que han incurrido sus abogados. Opinión mayoritaria, pág. 37.

II

Debemos reconsiderar. Ciertamente los abogados Aldarondo Ortiz y Pagán incumplieron con la Regla 34(c) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A, al some-

ter evidencia documental que no presentaron ante el ilustrado foro de instancia. Sin embargo, ello no amerita la censura y la crítica que, acumulativamente, se les hace. Nos preocupa sobremanera la conjetura dimanante de la interrogante mayoritaria de "si ello es producto del desgano que produce la falta de convicción profesional o del avalamiento pro forma de unas expresiones públicas". Opinión mayoritaria, pág. 37. En un caso de esta naturaleza, de trasfondo político-partidista, debemos ser cuidadosos y evitar el efecto disuasivo (*chilling effect*) inintencional de una sanción disciplinaria. En particular, si se presta a malinterpretaciones en cuanto a la legitimidad de los reclamos de un partido político sobre derechos electorales fundados en planteamientos *novedosos*.

## III

Según nuestro disenso, ¿puede afirmarse que carecían de méritos los planteamientos de *derecho* del P.N.P.? Más aún, no lo reconoció así la mayoría en el esc. 11 al verse compelida a hacer su "propia interpretación del derecho aplicable", y no descansar exclusivamente "en las interpretaciones de la ley que *erróneamente* puedan haber hechos las partes o el presidente de la [Comisión Estatal de Elecciones] . . .". (Énfasis suplido.) Opinión mayoritaria, pág. 39. Si el Presidente, la Comisión Estatal de Elecciones y las partes interpretaron erróneamente la ley, ¿puede tacharse de frívolo el recurso debido a unas vicisitudes evidenciarias explicables?

Veintinueve (29) páginas le tomó a la mayoría del Tribunal sostener el dictamen desestimatorio del ilustrado foro de instancia. Es innegable que los abogados Pagán y Aldarondo Ortiz confrontaron serias dificultades resultantes del *modus operandi* de la Comisión Estatal de Elecciones. *Inexplicablemente, la Comisión Estatal de Elecciones nunca redujo a escrito ni fundamentó su determinación de anular automáticamente toda papeleta que contuviera iniciales.* Siendo

así, lo menos que debería hacer la mayoría del Tribunal es aclarar el esc. 1 y eliminar toda referencia al incumplimiento de las reglas aplicables en la revisión de decisiones administrativas. La determinación *verbal* de la Comisión Estatal de Elecciones fue adoptada el 17 de noviembre de 1988 y el P.N.P. acudió al día siguiente al Tribunal Superior. Al hacerlo, corrió contra el tiempo y una probable certificación fundada en la nulidad radical de un sinnúmero de papeletas. ¿Puede culpársele? En el plano ético, ¿justificaba censurar a sus abogados por no estar totalmente preparados?

En resumen, es evidente que el trámite de revisión se confrontó con unas dificultades relacionadas con la identificación, la reproducción urgente de las papeletas en cuestión y la localización de testigos.

## IV

Aclarado el trasfondo del recurso, debimos aceptar, como señalamiento *bona fide* forense, la siguiente afirmación de los abogados Pagán y Aldarondo Ortiz:

> Los abogados suscribientes nunca intentaron incumplir cláusulas reglamentarias procesales ni mucho menos cánones de ética profesional. Dentro de la encrucijada en que toda esta situación, creada por la propia naturaleza y rapidez del suceso eleccionario, *los colocó, creyeron lo m[á]s prudente y honesto presentarle toda la verdad, según se la habían informado, al Poder Judicial del cual este Honorable Foro es el Tribunal Supremo.* (Énfasis suplido.) Moción informativa, aclaratoria y de reconsideración parcial, pág. 5.

*En justicia bastaba, pues, una simple amonestación y no un repudio categórico ni una censura tan absoluta.*